BANK OF NEWBERRY *v.* HENRY W. STEGALL *et al.*

1. BANKS AND BANKING: FOREIGN BANKS CANNOT APPOINT AGENTS IN THIS STATE: BOND CONDITIONED FOR THE PERFORMANCE OF DUTIES OF AGENT, VOID.—A bank, incorporated by the legislature of a sister State, cannot appoint an agent in this State for the purpose of employing

its capital here in the business of banking : such an appointment is against the laws and policy of the State of Miss., and a bond, executed by such agent, and conditioned for the faithful performance of his duties, is null and void.

2. SAME : CASE IN JUDGMENT.—The Bank of Newberry, South Carolina, appointed one Brown its agent at Smithville, Miss. Brown, with defendants in error as his securities, executed his bond to the bank in the penalty of forty thousand dollars, conditioned that he would faithfully discharge the duties of his appointment, and account for all moneys, goods, and choses in action received by him, and save the bank harmless from all damage and loss which it may sustain by reason of any act or neglect of said Brown. The bank brought this action on the bond against the sureties of Brown. Held—That the appointment of Brown was against the laws and policy of the State of Miss., and that the action could not be sustained.

3. SAME : TAX ON CIRCULATION OF FOREIGN BANKS : OBJECT OF LAW.— The act of the legislature of 1857, imposing a tax of two per cent. on the circulation of the banks of other States brought into this State for the purpose of being loaned, or circulated by way of loan, &c., was not intended to authorize the circulation of foreign bank paper, or to repeal the law against unauthorized banking, but to enforce more effectually the prohibition.

4. ILLEGAL CONTRACTS : VOID IN PART, VOID IN TOTO.—Illegality in part of a contract will avoid the entire contract, unless that which is good can be separated from, and is independent of that which is illegal.

ERROR to Circuit Court of Monroe county. Hon. Joel M. Acker, judge.

The substance of the pleadings will be found in the opinion of the court.

*Sale* and *Phelan* for plaintiff in error.

Suit by plaintiff in error against defendants on bond of Brown, as agent of bank, assigning breaches. Defendants filed twenty-nine pleas! Plaintiff moved to strike out six—took issue on six, and demurred to balance. The demurrer was extended back to the declaration. Its sufficiency will first be considered. The objections to it, of course, can only be known from argument of counsel in court below. We will notice them as they appear in a brief there filed.

1. " That the prayer is for more than the penalty of the bond," &c.

This is immaterial. No judgment can be rendered against

the securities above the penalty.   It would only be error to do
so.   This is the decision in cases cited.

2.  " The *form* of the action is covenant."   The Code has
abolished such objections (p. 491).

3.  " The breaches are uncertain as to time, place and amount."

The breaches are most *definite;* but Code only requires " suf-
ficient matter of substance for the court to proceed upon the
merits."

4.  " The declaration makes the contract exist, partly in writ-
ing, and partly in parol."

We can perceive no force in this objection.   It is not true.
The contract is in the *bond* in which he is acknowledged to
have been appointed agent, and which requires him to perform
certain duties.   The breach is the non-performance of those
specified duties.   Admit that the consideration does *not* appear
in the bond, it is not required in this State.   4 S. & M. 91.
Such objection does not apply to an *executed* contract.   The
*acceptance* of the trust renders party liable for *malfeasance.*

5.  " The acts of corporations, *when assembled* beyond the
limits of State granting the charter, *are void ;* and declaration
shows that Brown was appointed by corporation *assembled in
this State.*"

This objection is based upon the merely formal allegation
which lays the venue " at the county aforesaid ; " and the ex-
pression in the bond, that Brown " had been duly appointed
agent of said bank *at* the town of Smithville."   The first is
frivolous.   Code 492.   The last is not true.   The language does
not even *include* the idea that the bank had made the *appoint-
ment* at Smithville ; but that Brown was agent *at* Smithville,
" *duly* appointed."   They are *estopped* by their deed from
denying the fact.

6.  " That a contract must be *mutual,* and founded *on a consi-
deration.*"

This is the third time this principle of want of consideration
has been invoked.   We will notice it no farther.   As to the
" mutuality " of the contract, it is argued " that the bank had
no power to appoint such an agent ; " " that the bond was

voluntary," and "that the consideration arose out of an illegal act." These points are included in the next specification, which is as follows:

7. "The 'agency' at Smithville was unauthorized and illegal."

This is THE objection to the declaration. Its argument occupies twelve closely written pages, asserting the plainest principles, and citing a catalogue of authorities.. We shall not attempt to analyze each *special* point made under this assignment, nor to dissect the multitude of *cases* cited. A *single principle*, settled in the Supreme Court of the U. S. in case of *Bank of Augusta* v. *Earle*, 13 Peters, 587, in connection with the *charter* of the plaintiff, and applied to the *contract*, set forth in declaration, must decide this issue. The principle referred to is thus stated: "A corporation can make no *contracts*, and do no *acts*, either within or without the State which creates it, except such are authorized by its charter, and those acts must, also, be done by such *officers* or *agents*, and in such manner, as the charter authorizes;" and such powers may be thus exercised in a *foreign* State, unless repugnant to its policy. 13 Peters, 587. This principle is distinctly adopted in our Code, p. 297, art. 30.

What, then, are the provisions of the *charter* of the Newberry Bank, with reference to the contract, set forth in the declaration? Could such an *agent*, clothed with such *powers* and *duties*, be created in South Carolina?

The charter of the Newberry Bank consists of the charters of the "*Planters and Mechanics' Bank*," the "*Union Bank*," and the "*Commercial Bank.*" It is found in the "act to *re*-charter" (the banks last named), "and to *incorporate*" others; among them the Bank of Newberry. The clause is in these words:

"Which said banks shall have and possess the same rights and privileges, and be subject to the same duties, liabilities, obligations, regulations and restrictions, herein provided for the said Planters and Mechanics' Bank, and Union Bank, and Commercial Bank." Pamp. Acts S. C. 1852, p. 212.

To the *above act*, therefore, and to the *charters* of the said

10

banks, thereby renewed, must we refer for the powers of the Newberry Bank.

The condition of Brown's bond is, "that he shall well and faithfully account for all the *moneys, goods,* and *choses in action,* belonging to the bank," &c.

Did the bank have power to deal in such things? The following is the second section of the charter of the *Union* Bank:

"The said company is hereby made capable in law to have, *purchase,* receive, possess, enjoy, and retain    *    *    *    *    *    *    *    *    *    *    *    *    *    goods,* chattels, *promissory notes, bills of exchange,* and *all other* choses in action, moneys and effects, of what kind, nature, or quality soever;    *    *    *    and the same to *sell, alien, or dispose of.*" Statutes So. Ca., vol. 8, p. 15.

The charter of the "*Mechanics' Bank*" is, substantially, the same. Ib. p. 18.

The charter of the "*Commercial Bank*" is *identical* with the clause quoted, with this addition:

"Also to discount bills of exchange and promissory notes at a rate of interest not to exceed one per cent. for sixty days. Ib. p. 59.

The power of the *Newberry Bank* to "*purchase*" and acquire "moneys, goods, and choses in action," as specified in Brown's bond, is full and express. The power to "*sell, alien,* and *dispose* of the same," is equally ample.

Could said bank, by an *agent,* exercise this power in *South Carolina?* Could it appoint an agent *there* to "*take charge* of all moneys, bank-notes, and evidences of debt;*" and " with the same to *purchase* bills of exchange, promissory notes, &c.?*" No *special* form is required to be granted in a charter to enable a corporation to appoint *agents.* "The *general* power, to *purchase* bills, without restriction as to *place,* by its fair and natural import, authorized the bank to make such *purchases wherever* it was found most convenient and profitable to the institution, *and to employ suitable agents for that purpose.*" 13 Peters, 588.

This single sentence is a reply to every objection to the declaration.

But we need not rely on this "*general* power to purchase bills" for the *implied* power to do so through an *agent.* The power to appoint such "officers and agents" as shall be deemed necessary to execute the business of the corporation, is *express* in all the charters. St. S. C. pp. 15, 19, 61.

As to the *mode* of appointment of an agent by a corporation, the principle is, that in the absence of some *specific form* required by the charter, any mode may be adopted consistent with the general nature of the institution. No *manner* of appointment is specified in either of the charters ; but the charter of the Commercial Bank says "that the appointment shall be in such MANNER and upon such terms as the directors shall deem necessary and proper." Ib. p. 61.

"Modern decisions place corporations, with regard to their *mode of appointing agents*, and making contracts in general, upon the same footing with natural persons." Angel Cor. p. 187.

The *declaration* alleges that "Brown was *duly* and *regularly* appointed by plaintiff the agent thereof." This is sufficient.

The *bond* set out in the declaration, recites that Brown had "been *duly appointed* agent of said bank." Defendants, at least on demurrer, are estopped by that recital.

We have now attempted to show that an agency, for the purposes set forth in the declaration, might have been created by the bank in *South Carolina.* Our *statute*, declaratory of the common law, enacts that such contracts, and the acts of the agents of foreign corporations, shall be valid in this State unless such acts or contracts are in violation of its public policy. Code, p. 297.

Was the contract set forth in violation of the public policy of Mississippi ?

Defendants allege it to be in violation of the act of Feb. 15th, 1840, "To prevent unauthorized banking" (Hutch. Code, p. 328) ; "The act to tax brokers," Jan. 20th, 1841 (H. Code, p. 179), and the arts. under the head of "Banking and Bank-Notes." Rev. Code, 576.

The legislation *first* and *last* mentioned, may be treated of together. The last is but a modification of the first, when transferred to the Code ; containing no alteration material to the issue.

This legislation was, as its title imports, against "*unauthorized* banking," and designed to prohibit the issuance and circulation of "notes, by *private* bankers," "commonly called shinplasters." It has no reference to the transactions of incorporated banking institutions, *anywhere*. The act of February 15, 1840, transferred to the Code, *and placed among the provisions of the act of* 1850, in reference to the circulation of notes under $5, is conclusive against the position that this legislation applied to the notes of regular banking corporations of other States. It says : "It shall not be lawful to pass any bank-note, made by any corporation of this, *or any other State*, * * of a less denomination than $5 " (p. 577, art. 26). This recognizes the lawful presence and circulation of notes of foreign corporations, *over that denomination*.

In 1840 began the legislative attack on the banks ; and the State was swept of them. The amount of *foreign* paper in the State, during the existence of our own banks, was too inconsiderable to attract legislative notice. No tax was placed upon it ; no license required of any broker to enable him to deal in it. Six days after the passage of the act of 1840, the act was passed requiring our banks to pay specie, and placing them in the line of liquidation. H. Code, 324. The State was left without a circulating medium, but for *foreign* bank paper. That it would then come to supply the vacuum was palpable, and if the policy of the State was to prevent its introduction, is it possible to conceive that it would *not then have been done*, in an unmistakable manner ? On the contrary, the next year, in January, 1841, the legislature recognized the legality of its presence by classing it with the issue of our own banks, in the act requiring a license of every broker dealing in either. H. Code, 179. In 1850, the Mississippi banks were all wound up. In that year, the use of its notes by a foreign corporation in this State was recognized and taxed. Acts 1850, p. 47. In 1851, the sending or bringing into this State, by any corporation, of bank paper, for the purpose of being *loaned*, or put in circulation by way of loan or brokerage, *or* in the *purchase* of bonds, notes, or bills of exchange, is recognized and taxed. Code, 73. It is well known that the existence of such agencies, of foreign corporations, at that time

in this State, caused the passage of the act. In 1861, certain foreign bank-notes were authorized to be received in payment of taxes. Acts 1861, p.   .

2. The act in relation to "*brokers*" has no application to *foreign corporations*. It applies, and can only apply to *natural persons*. The license is issued to "persons," by the clerk of the county "where such person *resides*. Code, 86.

In 1850, the use of "*money*" in this State, by *any foreign* corporation—whether a *banking* institution or not—through its agent, was recognized and taxed. Pam. 47. The *penalty* annexed to the broker law, being expressly confined to "*persons*," is to be strictly construed, and could not be extended to foreign corporations, if susceptible of punishment; but neither fine nor imprisonment could be imposed upon them. Therefore a tax upon money employed by them, in this State, was levied upon their operations.

But, as a *foreign corporation* could not be punished for doing a "*brokerage*" business without license;—and as a tax on "*money*"—gold and silver—"loaned at interest, or invested in the purchase of notes," &c., did not reach the case of foreign corporations, using their own bills, either as mere *lenders*, or *purchasers* of other securities, the act of 1857 was passed, levying a heavy tax upon their own bills sent into this State, for the purpose "of being loaned;" or "put in circulation, by way of loan. *or brokerage;* or, in the purchase of bonds," &c. Code, 73. This is the only law that applies to a "*brokerage*" business, conducted by a foreign banking corporation in Miss. The *absence* of any word in the broker act applicable to a foreign corporation—the *presence* of terms repugnant to such a. construction, and the existence of a *separate* provision on that subject, *specially* applicable to such corporation, show that they are not required to obtain a license, to engage in such business.

Again, the facts set forth do not constitute said plaintiff a "broker." A broker is not one who uses his own means, and *deals for himself;* or every person who uses his funds in such transactions would be a broker. "A broker is a party *who*

*acts for others* in the *negotiation* of contracts,  *  * and is the *agent of both parties.*" 1 Bouv. Dic. 225 ; Smith's Com. Law, 588; 141, 142, note.

We close this branch of the case with a quotation from the opinion in *Bank of Augusta* v. *Earle*, p. 597 : "When a court is called on to declare contracts thus made to be void, upon the ground that they conflict with the *policy of the State*, the line of that policy should be *very clear* and *distinct* to justify the court in sustaining the defence."

As to what determines the *policy* of a State, see 37 Miss. 235.

The last objection to the declaration made in the briefs of counsel is, that the obligations of the securities are enlarged, in this :—

1. It makes the bond an " additional and cumulative " security; and requires them to take issue upon the execution of the first bond.

The complaint alleges, by way of inducement, and as explanatory of the transaction in which the bond of defendants originated, that a previous bond for the security of *previous* transactions had been given; and that the bond of defendants was executed in order to " *continue him in said agency*," and as security for his future good conduct ; but how this requires defendants " to take issue upon the execution of the *first* bond," we cannot imagine. They are only sought to be held liable on their own bond, upon transactions had after its execution. Every breach is alleged to have occurred " *after* the execution and delivery of the aforesaid writing obligatory."

" 2. It extends the power of the agent beyond *Smithville*." This quibble is almost impalpable. We presume the idea is, that if the action of Brown, for which they are attempted to be held liable, was not confined within the indefinite limits of a petty country village, the bond is void. We will not stop to apply the commonest rules of construction to the contract set forth in the bond; but simply deny that it appears upon the declaration that any breach was *not* committed *within that town*. On the contrary, we assert that every breach appears to have been there committed. The objection is that Brown

Bank of Newberry *v.* Stegall et al.

"was agent *at Smithville*." Every breach—in the *reception* of funds, and in the *failure* to account for them—is alleged to have been committed by Brown " as *such* agent," *i.e.*, as agent at Smithville!

Two other objections are made to the declaration, under the doctrine of the right of securities to stand upon the strict language of their contract, which it does not seem necessary to notice. The most casual perusal of bond and breaches will show they are untenable.

We now ask the attention of the court to one position. Much argument has been made—and the true issue *on the demurrer to declaration* overwhelmed by a volume of positions and authorities. Now, admit that the bank did not have power to do *everything* alleged in the declaration; that it could not own or dispose of *all* the different kinds of property or choses in action sent to Brown; that it could not appoint him, as agent, to do *all* the duties specified ; that the bond is not valid, for the performance of *all* the obligations therein contained; and that a recovery cannot be had upon *all* the breaches alleged— yet, if the bank could own and dispose of *any one* of the species of property or choses in action specified—in *any one* of the ways mentioned ; and could appoint Brown, as agent, to receive and dispose of this *one* thing, in that *one* way ; and the bond includes this *single thing*, to be disposed of in this single way, as among the duties alleged—and this *legal* action and contract can be separated from the rest—the declaration is sufficient, and the *general* demurrer must be overruled. We have shown that the bank had the right to hold "MONEY," and to *dispose* of it, in the "*purchase* of bills and notes "—that it could, then, appoint an agent *for that purpose* " in such *manner*, and upon *such terms*," as it " might deem proper ;" and, therefore, might require of that agent a *bond* for the performance of that duty. Whatever *else*, then, may appear upon the declaration, this much *does* appear, and in a form independent of any collateral fact or allegation.

The *bond* says, "he shall faithfully *account* for all *moneys* which shall come to the hands or care of said Brown; "

the *first* breach alleges, " that sums of money were placed in his hands which he has failed to account for." Admit, therefore, the insufficiency of all the other breaches, this one is surely sufficient; and, if so, the demurrer will be overruled. " A demurrer filed to *several* counts in a declaration, and all the counts *but one* are obnoxious to the exceptions, the demurrer must be overruled." 28 Miss. 56.

*James T. Harrison* and *Charles R. Crusoe* for defendants in error.

This is an action of covenant upon a penal bond, against the sureties. The suit was dismissed as to the principal obligor. The bond bears date on the 24th day of July, 1857, and is in the penalty of forty thousand dollars. The declaration assigns breaches upon the condition of the bond of six hundred thousand dollars each, amounting in the aggregate to two millions and four hundred thousand dollars, and concludes to plaintiff's damage eighty thousand dollars. The sureties interposed twenty-nine pleas, and the plaintiff took issue upon six; moved to strike out five, because they are alleged to amount in substance to the same as others upon which issue has been taken, and demurred to eighteen. The demurrer was visited upon the declaration, which was held to be bad. The pleas were intended to bring up a settlement of the different legal questions upon the face of the papers, and the demurrer expected to reach back to the declaration.

The declaration is bad.

1. The suit is against the sureties only, and they have a right to stand on the very terms of their contract. It is perfectly clear as to them that a judgment cannot be rendered beyond the penalty, which is forty thousand dollars. Each breach is for six hundred thousand dollars, and if the declaration is good, the sureties might be subjected to liability for two millions of dollars, and upwards.

*Farrar & Brown* v. *United States*, 5 Peters, 385, 5 Peters, 373; *United States* v. *Brown*, Paine's C. C. Rep. 425, 422; *Farrar* v. *Christy's Administrator*, 24 Missouri Rep. 454, 474.

Bank of Newberry *v.* Stegall et al.

2. The form of the action is covenant, and covenant will not lie on a penal bond conditioned to be defeated by the performance of collateral acts. *United States* v. *Brown,* Paine's C. C. Rep. 422 ; *The State Use, &c.* v. *Woodward,* 8 Missouri Rep. 353 ; *Farrar* v. *Christy's Administrator,* 24 ib. 474.

3. The plaintiff is a corporation chartered by the General Assembly of the State of South Carolina, and is located at the town of Newberry, in said State.

All votes and proceedings of persons professing to act in the capacity of corporations, when assembled beyond the bounds of the State granting the charter of corporation, are wholly void.

Angell & Ames on Corporations, sec. 498, sec. 274 ; 27 Maine, 509 ; 28 ib. 345.

The declaration in this case affirmatively shows, that in Monroe county, in the State of Mississippi, the plaintiff duly and regularly, as it is alleged, *appointed* said Jos. Brown, agent; that Brown there *accepted* the agency ; that it was then and there *stipulated* and *agreed* by and between said Brown and the plaintiff, &c. ; and that on the 24th day of July, 1857, in the said county of Monroe the obligors *executed and delivered said bond sued on to the plaintiff.* The bond is set out at large, and commences thus :—" The State of Mississippi, Monroe county," and is attested before a witness as signed, sealed, and delivered in said county of Monroe. Can said corporation migrate to Mississippi, or gainsay the declaration, and dispute the face of the obligation declared on ? The entire agreement was made and entered into in the State of Mississippi, and the sureties never contracted elsewhere. They stand on the bond. *Hamtrack* v. *Selden, Withers & Co.,* 12 Grattan, 31.

4. It is the very essence of a contract that it be mutual, and of course that there be parties to it, and to be valid it must also be founded on a consideration. Angell & Ames on Corp., sec. 255 ; 1 Story on Cont., secs. 448, 453 ; 1 Parsons on Cont. 374, and notes.

The charter creates no such " agency " at Smithville, and establishes no " certain fees, rewards, or pecuniary emoluments " to which such agent became " entitled ; " the bond

stipulates for none; there was no contract for any.    If so, when, where, and by whom made, and what the nature and amount thereof?    If there was any *contract*, it must be set out. The sureties are not parties to any such contract.    And does the contract exist partly in writing and partly in parol?

A voluntary bond, by the laws of Mississippi, is not binding on the obligors.    *The State* v. *Bartlett,* 30 Mississippi Rep. 624; *McLaurin* v. *Parker et al.,* 24 Mississippi, 509.

The bond is not an official one.    No such "appointment" is known to the charter.    The "duties" of the appointment and the "fees, rewards, and emoluments," must be matters of contract and agreement.    The "agent" is not "entitled" to any "fees" as such under the charter.

And the plaintiff had no right or authority to take or receive the bond.    *Newsom* v. *Thigpen,* 30 Mississippi Rep. 414; 1 Leigh. 485; 3 Wendell, 482–485.

And it is essential that the consideration should arise out of a legal act.    26 Mississippi Rep. 169; 1 Howard Miss. Rep. 150.

5. The "agency" at Smithville was unauthorized and illegal.

The defendants are sought to be made liable for the alleged default of Joseph Brown as the *agent* of the plaintiff, as sureties for his good conduct in such agency.

An agent is a person authorized to do some act or acts *in the name of another,* who is called the *principal.*    1 Story on Cont. sec. 134; 2 Kent's Com. 612; Paley on Agency, 1.

The declaration shows that the plaintiff, a foreign corporation, carried on a banking business at Smithville, in this State, for nearly three years, to an extent greater in amount than the capital stock limited in its charter as *principal,* through said Brown as *agent,* who gave a bond for the due performance of the "duties of his appointment."    It is expressly alleged that said Brown was the agent of said bank at Smithville for about three years, dealing to the extent of hundreds upon hundreds of thousands of dollars, and that for his services he was entitled to certain fees, rewards, and pecuniary emoluments; and that he was to *use* and *invest* for and on account of the plaintiff "money," "bank-notes," "credits," "checks," and "other evi-

dences of debt and commercial securities," in *discounting* and *purchasing*, for and on account of said bank, *bills of exchange, promissory notes, checks, and other evidences of debt and commercial securities, such as banks, bankers, and exchange brokers "usually deal in."* This we call banking with a vengeance. The declaration further shows that said Brown was to "deal in " money, bank-notes, checks, credits, commercial securities, and other evidences of debt, such as banks, bankers, and exchange brokers "usually deal in," when and where he pleased; that all the effects, assets, and securities were "subject to his order and control."

The act of 1852 (12 Stat. 212) incorporating the Bank of Newberry is a public act, which the court will notice *ex officio*, and which need not be set forth in the pleadings.   *Bank* v. *Railroad Company*, 9 Richardson's Law Rep. 495.

By the act of 1852, eight new banks, including the Bank of Newberry, were incorporated, and the Planters and Mechanics' Bank, the Union Bank, and the Bank of Columbia, three old banks, were re-chartered subject to additional regulations and restrictions imposed by said act.   The new banks were incorporated with the same powers and privileges that belonged to the above-named old banks, and subject to the same restrictions imposed by the act of 1852.   *State* v. *Lehre*, 7 Richardson's Law Rep. 234 ; 12 So. Car. Stat. 212.   See old charters, 8 So. Car. Stat. 14, 16, 18, 19, 20, 22, 23, 36, 58, 59, 61, 63.   See pamphlet copy herewith filed.

Among the new banks was "one *at Newberry*, to be styled the 'Bank of Newberry, South Carolina,' with a capital of three hundred thousand dollars."   Pamphlet, p. 7.   "Which bank shall be subject to the same duties, obligations, regulations and restrictions provided for said Planters and Mechanics' Bank, and Union Bank, and Commercial Bank."   Ib. p. 7.

And it is "made lawful " for the *directors* to establish *offices* wheresoever they may think fit *within the State of South Carolina*, for the purposes of *discount and deposit only*.   8 Stat. 22 ; Pamphlet cop. 15.

And a majority of the *stockholders* may establish *branches* at

Columbia or Camden, or at any other town or place *within the State.* 8 Stat. 22; Pamphlet, 15.

There shall be thirteen directors, to be chosen annually from among the stockholders, and one of the directors shall be chosen president. Pamphlet, p. 11; 8 Stat. 19.

One of the restrictions contained in the charter is: That the corporation shall not be permitted to purchase any public debt whatever, nor directly or indirectly "deal or trade" in anything *except* bills of exchange, gold or silver *bullion*, or in the sale of goods really and truly pledged for money lent, &c.; neither shall said corporation take more than at the rate of six per centum per annum, for or upon *its loans or discounts.* 8 Stat. 20, Pamphlet, 13, year 1810.

In 1817 an act was passed declaring that the South Carolina banks might have "power to vest" part of their capital in the stock of that State or of the United States. Pamphlet, 19; 8 Stat. 36.

In 1831 the Commercial Bank of Columbia, South Carolina, was first incorporated, and its charter declares that the corporation shall not be permitted to purchase any public debt whatever, except stock of the State or United States; nor shall, directly or indirectly, "deal or trade" in anything except notes, bills of exchange, gold or silver bullion, or in the sale of goods, as above. 8 Stat. 63.

And it is provided that no less than five directors shall constitute a board for the transaction of business, of whom the president shall always be one. 8 ib. 61.

The entire effects and property of the bank shall not, in the whole, exceed three times the amount of the capital stock. 8 Stat. 59. And power is given to discount bills of exchange and promissory notes at a rate of interest not exceeding one per cent. for sixty days. 8 ib. 59, 60.

One of the restrictions imposed by the act of 1852 was: That it shall not be lawful for the said bank, except in settlement with other banks, to *pay or deliver out in payment* or satisfaction of any demand upon it, *or by way of loan or discount*, any bill, note, check, or other paper, of any other bank, under the penalty of one hundred dollars for every such offence. Pamphlet, 6.

By the act of 1817, it is provided that the *president, directors* and *company* of any incorporated bank *in the State* shall be authorized to make loans on negotiable paper, for any period not exceeding twelve months, and also to open an account and give a credit to any other bank or banks of the sister States. Pamphlet 10, S. Stat. 36.

From these different provisions, powers, restrictions and limitations, it is manifest that the charter gives no power or authority to said bank of Newberry to migrate to Mississippi, establish such an agency at Smithville, or carry on such a banking business there.

A corporation created in one State can contract business in another only with the consent, express or implied, of the latter State. Angell & Ames on Corp. §§ 272, 273, 374; 12 Grattan, 30; 13 Grattan, 767; 20 Ohio, 283, 301; 4 B. Monroe, 90, 92; 11 Humph. 1; 13 Peters, 521; 14 Peters, 122; 18 Howard, U. S. Rep. 407.

And the corporation must show that the laws of its creation gave it authority to make such contracts through such agents. Angell & Ames on Corp. §§ 273, 161; 13 Peters, 587, 521.

The law confers the capacity to contract and regulates the transaction of the business. Any departure from the sphere of business prescribed to a corporation is unlawful, and their engagements made in the prosecution of an unlawful business are void. 3 Selden, 328, 364, 513; 7 Wendell, 31; 5 Barbour, 649. Angell & Ames on Corp. §§ 291, 299, 252, 253, and note.

Banking associations possess authority only to carry on the business of banking in the manner and with the powers specified in the act of incorporation. 3 Selden, 328.

A corporation can make no contract, except it is expressly authorized by its charter to do so, or the contract is necessarily incident to the purposes of its creation. *Bacon et al.* v. *Miss. Ins. Co.* 31 Mississippi R. 116.

The powers of a corporation are derived from the law and its charter, and no by-law of a corporation can enlarge its corporate powers. *Andrews* v. *Ins. Co.* 27 Maine, 256.

Restrictive clauses, introduced into bank charters, prove nothing in favor of the corporation. They are put there through an abundance of caution.   3 Selden, 345.

A specification of certain powers operates as a restraint on such objects only, and is an implied prohibition of other and distinct powers.   5 Conn. R. 572; 15 Johns. Rep. 382, 383; 2 Cowen, 699; 3 Edward's Ch. Rep. 315.

Where a power to lend money in a particular mode is given to a corporation, all other modes are necessarily excluded.   3 Wendell, 482.

In the present case the charter *located* the bank *at Newberry*, in the State of South Carolina. Its *place* of doing business as a bank was fixed and determined: No authority was given to migrate elsewhere.   Not only so, but special power was given, if it became necessary to do business elsewhere, to locate *offices* in a particular mode, by the directors, *within the State of South Carolina*, and not elsewhere, and for the limited purposes of *discount and deposit only;* and a *branch* could only be established *within the State of South Carolina*, and it had to be done *by a majority of the stockholders*. The two *modes* of enlarging the business of the bank, and extending the area of its operations, are thus distinctly and specially provided for, and all other modes and places are necessarily and impliedly excluded by the very terms and provisions of the charter itself.

An authority for doing a thing *at one place* is no authority for doing it at another and different place.   It would be idle for the legislature to locate a bank, if the institution could perambulate the State, and establish *agencies* whenever and wherever it might think it for its interest.   A corporation is an artificial being created by law, with limited powers, and for specified purposes; and there is a tacit condition annexed to its charter that it shall exercise its franchises in the manner and for the purposes specified, and for no other purposes and in no other manner.   *Attorney General* v. *Oakland County Bank*, 1 Walker's Mich. Rep., 90.   And in the case of *The People* v. *The Oakland County Bank*, 1 Douglass' Mich. Rep., 288, it is

said that : " By the act of incorporation the stockholders were authorized to locate the bank in the county of Oakland." " The most important question is whether the establishment of an *agency* in the city of Detroit was a 'violation of the charter." " It is quite manifest that the defendant could not establish in this city an *office of discount*." p. 288.   " With regard," say the court, " to the purchase and sale- of bills of exchange, in the manner and for the purposes. stated, we are equally clear."   Stript of all disguise, is it not discounting paper? Is it not the exercise of *banking powers?*   We think it is. p. 289.

In the case of *The People* v. *The Trustees of Geneva College,* 5 Wendell, 211, 219, it was held that the corporation was restricted in its operations *to the place of its location.*   In speaking of the Bank of Geneva, the court say that although the charter had not contained an express prohibition against carrying on business elsewhere, yet, " without such a prohibition there could be no question on the subject." p. 211, 219.

In *The Bank of Marietta* v. *Tindall,* 2 Randolph, 474, it was held, that it would not be permitted to a bank in Ohio to establish an *agency* in Virginia *for discounting notes,* or for carrying on any other *banking operations,* nor could they sustain an action on any such note acquired by them.   So in Slaughter's case, 13 Grattan, 774.

It was decided in *Atterberry* v. *Knox & McKee,* 4 B. Monroe, 90–92, that Maryland had no power to· charter a bank and give to it authority to establish *agencies,* companies, or associations, to do the business of banking within the limits of Virginia; and such agencies, associations and companies, assuming to act, must be deemed *unchartered,* within the contemplation of the statute against unauthorized banking.   *Atterberry* v. *Knox & McKee,* 4 B. Monroe, 90–92 ; *Atterberry* v. *Knox & McKee,* 8 Dana, 282, 283 ; *Hamtrack* v. *Selden, Withers & Co.,* 12 Grattan, 28 ; *Pennington* v. *Townsend,* 7 Wendell, 276 ; *De Groot* v. *Van Duzen,* 20 Wendell, 390, 397, 398, 399 ; *Ayres et al.* v. *Manhattan Bank,* 20 Ohio, 283, 301, 302; Angell and Ames on Corp. § § 320, 374, 274, 273.

And it was held in *The City Council of Montgomery* v. *The Montgomery and Wetumpka Plank Road Company*, 31 Alabama, 3, 4, that the construction of the plank road *beyond the limits of the city* was unauthorized and void, and that the penal bond taken by the corporation was invalid, and could not be enforced by suit.

And see *Bacon et al.* v. *Mississippi Insurance Co.*, 31 Mississippi R. 116.

An undertaking for the fidelity of an agent of a corporation is limited to such acts as a corporation, by its charter, may lawfully require an agent to perform. The liability of the surety could only attach whilst the agent was employed in the discharge of duties *which the charter gave it a right to impose;* and if the company had no right to engage in banking, the surety of the agent of such corporation is not bound for the embezzlement of the funds of the corporation whilst the agent was engaged in the business of banking for the corporation. *Blair* v. *Perpetual Insurance Co.*, 10 Missouri R. 559, 560; Angell and Ames on Corp. § 320; *Fireman's Insurance Co.* v. *McMillan*, 29 Alabama Rep. 148.

The case of the *Bank of Augusta* v. *Earle*, 13 Peters, 597, was a very different one from this. It was an instance of a corporation chartered in Georgia to make a single contract in the line of its legitimate business in Alabama, and where the county of the State of Alabama permitted the contract to be made within her borders. It was the purchase of a bill of exchange *by an agent for collection*, who had the funds of the bank in his hands derived from bills or notes discounted by the bank in Georgia and payable in Mobile, where the bill was purchased by the agent, in order to remit the funds to the bank. 13 Peters, 521, 523, 585, 587. See *Slaughter* v. *The Commonwealth*, 13 Grattan, 773.

A corporation cannot be bound by its agents for acts not within the powers conferred upon it by its charter. Contracts based upon such acts are void, and a subsequent ratification of them by the directors will not render them valid. 5 Denio. 567, 582; 7 Johns. R. 157; 1 Story on Cont., §§ 162, 159, 160;

2 Peters, 661, 662; 1 Story's Eq. Jur. § 296; Story on Agency, §§ 235 to 241.

And a party is not *estopped* when sued by the corporation. 31 Alabama, 77, 88; 8 Gill & Johns. 284, 319; 2 Denio, 110; 7 Wendell, 31; 5 Cowen, 560; Angel & Ames on Corp. § 256.

By the charter of the Bank of Newberry the business of the corporation is required to be conducted and managed by its thirteen directors, including a president, and less than five directors shall not constitute a *board for the transaction of business*, of whom the president shall always be one. 8 Stat. 61.

All *discounts* are made under the authority of the directors, and the president and cashier have no authority for that purpose. 6 Peters, 51; 8 Peters, 12.

In such cases, the boards or persons specified, and they alone, for the transaction of the business, are, or can be, the *agents* of the corporation. Such being created agents by the charter, or act of incorporation, the power of appointing others in their stead, by the very law of its nature, never existed in the corporation. Angell & Ames on Corp. § 279; 12 Wheaton, 64, 113; 2 Johns. 110; 2 Cowen, 699; 5 Wendell, 552; 7 Cowen, 442. The power is *exclusive*. 5 Denio, 580.

And the authority delegated to the directors can only be exercised by them *when assembled as a board*. Angell & Ames on Corp. § 291; 12 Wheaton, 64; 6 Cond. Rep. 452; 13 Metc. 497.

The directors and president cannot assemble as a board beyond the State, and vote and transact the business of the bank at Smithville. Such a proceeding would be void. Angell & Ames on Corp. §§ 498, 274; 27 Maine, 509; 28 ib. 345, as we have previously shown. How, then, can the corporation or the directors delegate authority to Jos. Brown, as agent, to carry on or transact the business at Smithville, and make him board, president, and all? By the very law of its nature, the power of making such an appointment never existed in the corporation, and such an agency must necessarily be without authority and void.

Offices and branches, by the provisions of the charter, had

11

to be located and carried on within the State of South Carolina, and *an office was restricted to the business of discount and deposit.*  Yet, it is contended by the plaintiff, that the corporation could carry on a general business through an "*agency*" in another State, and confer upon a single individual, as agent, power and authority to do what an officer or a branch in South Carolina could not do. The corporation is the *principal* in such agency, and delegates the authority, and not only so, but delegates authority to do what the bank itself was prohibited from doing. Such agent, according to the declaration, could "deal and trade" in what the bank could not; he could "use and invest" the assets in a way the corporation had no power to do; he could transact the business of his principal without the restriction as to the president and five directors; he could "purchase" any kind of public or other evidences of debt and commercial securities, and "deal and trade in" gold and silver coin, money, checks, credits, "bank notes," and every kind of "evidences of debt," and every variety of "commercial security;" he could not only "discount," but could "purchase" all such securities and evidences of debt as banks, bankers, and exchange brokers "*usually deal in;*" he could trade in the paper of other banks and pay out and deliver "by way of loan and discount" any bill, note, check, or other paper of any other bank; hundreds of thousands of dollars, exceeding more than three times the whole amount of the capital of the bank, could be "kept subject to his order and control," and to be "used and invested" in such manner, and to such an extent, as he might think proper. The agent was fettered in nothing. He was *the bank*, and *more than the bank.*

The powers of corporations are to be *strictly* construed. 4 Peters, 152; 5 Cowen, 560; 2 Cowen, 699; 15 Johns. 383; 4 Alabama, 558; 31 ib. 76.

General words, in the statute are to be restrained and restricted by the other provisions of the charter.

*Beaty* v. *Lessee of Knowles,* 4 Peters, 152; *City Council, &c.,* v. *Montgomery and Wetumpka Plank Road Company,* 31 Alabama, 3, 4.

In the present case the *pleas*, also, set up the defence, that the agency at Smithville was without authority and unlawful.

6. In connection with the last point, it is further insisted that the "agency" at Smithville was in open violation of the laws and the known and declared public policy of the State of Mississippi.

It is now well settled that no action can be maintained upon a contract, the consideration of which is either immoral in itself or prohibited by law, or which is made in contravention of public policy; or which grows out of, or is in connection with an illegal or immoral act. *Deans* v. *McLendon*, 30 Mississippi Rep. 343–357; 2 Peters, 358, 359; 1 Story on Cont., §§ 487, 488.

Every contract made for or about any matter or thing prohibited, or made unlawful by statute, is a void contract. Addison on Contracts, 104, 105, 108, 110, 116·; Smith on Cont. (4 Amer. ed.), 226, 238, 239.

The agency at Smithville was in contravention of public policy. During the entire period covered by such agency there was not a single bank within the State of Mississippi. The known and declared policy of the State for the last twenty years has been opposition to banks and a paper currency. Applications for charters have been again and again refused by the legislature, and the most stringent laws were enacted in order to get rid of and wind up the old banks. It has become a practice with the legislature, out of an abundance of caution, to insert a proviso in the charters of insurance and other companies, that nothing therein contained shall be construed as giving any authority to carry on banking. The Democracy of Mississippi, the great dominant party in the State, have, ever since the days of the Union Bank, the Brandon Bank, *et omne hoc genus*, made opposition to bank charters and a paper currency a cardinal principle of their political faith. This public policy of the country is to be found in its written and its unwritten history, in its public laws, and in the every-day transactions of life. And there are many subjects upon which the policy of States is abundantly evident from the general scope of their legislation, and which do not need the aid of positive and

special law to guide the decisions of the courts.  *Bank of Augusta* v. *Earle*, 13 Peters, 597 ; see Hutchinson's Code, 324 to 334 inclusive.

On the 15th February, 1840, an act was passed expressly for the purpose of preventing "unauthorized banking." Hutch. Code, 328, 329.   The Revised Code of 1857 contains a statute against unauthorized banking.   New Code, 576.   The act of 1840 was in force at the time the bond sued on purports to have been executed.   It prohibits any person unauthorized by law to be in any way interested in any institution or company for the purpose of receiving deposits, *making discounts*, or issuing notes to be loaned or circulated as money.   § 1, p. 328.   It is made a penal offence.

It is also made a penal offence for any incorporated company without being authorized by law "*to employ any part of its effects*," or be in any way "*interested in any fund*" that shall be "*employed*" for any of the above purposes of receiving deposits, making discounts, etc.   § 3, p. 328.

It is further provided—That no person, association of persons, or *body corporate*, except such bodies as are *expressly* authorized by law, shall *keep any office* for the purpose of receiving deposits, *or discounting bills or notes*, or issuing any evidence of debt to be loaned or put in circulation as money, etc., unless *expressly authorized by law.* § 6, p. 329.

And it shall not be lawful for any person *or corporation to pass or offer to pass* "*as money*" *any bills*, promissory notes, commonly called shinplasters, or other evidences of debt, issued by any person or persons, or body corporate *not authorized by the laws of this State to issue bank notes.* § 8, p. 329.

The declaration shows that the plaintiff has acted in open defiance of this statute from beginning to end.

This corporation "without being authorized by the laws of this State to issue bank notes" established a regular agency in this State to pass as money their own bills and any and all bank bills, and to deal and trade in such paper.

"The plaintiff was "unauthorized by law" in "*making discounts*," etc., at Smithville.

And the Bank of Newberry, South Carolina, "employed part of its effects" and was "interested in a fund" that was employed for the purpose of *making discounts,* without being authorized by law to do so.

And last, but not least, the plaintiff was "a body corporate" (in South Carolina), and did "keep an office," at Smithsville, for the purpose of "discounting" "bills" and "notes," without being "expressly authorized by law."

We refer to the following cases upon the subject of "unauthorized banking :" *Atterberry* v. *Knox & McKee,* 4 B Monroe, 90, 92 ; *Atterberry* v. *Knox & McKee,* 8 Dana, 282, 283 ; *Hamtrack* v. *Selden & Withers,* 12 Grattan, 30 ; *Slaughter* v. *The Commonwealth,* 13 Grattan, 767 ; *Myers et al.* v. *Manhattan Bank,* 20 Ohio, 301, 302 ; *Pennington* v. *Townsend,* 7 Wendell, 276 ; *De Groot* v. *Van Duzer,* 20 Wendell, 390, 397, 391, 394 ; *Bank of Peru* v. *Fausworth,* 18 Ill. 563 ; *Darden* v. *Banks & Chambers,* 21 Georgia, 297.

This defense is also set up by the pleas. See pleas in 12 Grattan, 30, and 20 Wendell, 391, 392, 394.

The statute forbids receiving deposits, discounting bills of notes, issuing bank-paper, keeping an office, and passing or offering to pass as money, etc., without being authorized by law, etc.

The revenue law of 2d February, 1857, New Code, 72, 73, imposes a tax of twenty cents on every one hundred dollars on "*money*" loaned at interest *by individuals,* etc. ; but *two per cent.* is imposed upon every one hundred dollars of *bank-paper* SENT OR BROUGHT into this State by any corporation or individual "ISSUING" *the same for the purpose of being loaned or put in circulation by way of loan,* or brokerage, or the purchase of bonds, notes, or bills of exchange. New Code, 73.

This was a further attempt to drive this foreign bank-paper out of circulation in this State, and to prevent its introduction here. The statute did not repeal the law against unauthorized banking, but the statute against illegal banking was incorporated in the Revised Code together with the foregoing provision.

The revenue act only applies to *the person or corporation issuing the bank-paper*, and extends to bank-paper *sent* or *brought* into this State by such person or corporation for the purpose of being loaned, or put in circulation by way of loan, etc.   It does not legalize the *passing* of the bank-paper, or the issuing of it, or discounting with it, or keeping an office of discount, or the like.

For nearly three years the plaintiff did business as a bank, through the agency of Brown, at Smithville, and without any lawful authority.   As a banking corporation without being " expressly authorized by law," or authorized at all, the institution " kept an office " for the purpose of discounting bills, notes, etc., and did discount them by hundreds of thousands. The office was kept for that particular business.   What is meant by the words, " to keep an office " ?   They mean *a place of business*.   We ask if a lawyer keeps an office in town, and where the stage office is kept, and bankers and brokers keep offices, and the like is done by other persons.   And there are railroad offices, and steamboat offices, and insurance company offices.   The bond was given to secure the due performance of the " duties " of the agent who received the " appointment " to conduct and carry on the business for the principal, at a specified place, and the agent was " entitled " to " certain fees, rewards, and pecuniary emoluments " by way of compensation, and the business was to consist in discounting bills and notes, in using and investing the means of the bank, and in discounting for and on account of the bank, and purchasing and dealing and trading in money, bank-notes, credits, checks, and other evidences of debt and commercial securities such as banks, bankers, and exchange brokers usually deal in ; and all these operations were to be conducted and carried on at such particular place, for an indefinite length of time.   If this is not *keeping an office*, it would be difficult to tell what it is to " keep any office."

7. The declaration shows upon its face that the plaintiff at, and by, and through said " agency," carried on a regular *brokerage business*, as well as that of banking.   Each and every

broker or factor "dealing" in gold or silver, or in the notes or banks of this State, of any other State, or of the United States, or in drafts or bills of exchange drawn for the payment of money, *by buying and selling the same, must obtain license,* &c. Hutch. Code, 179. And if any person shall buy or sell, barter or exchange, any gold or silver, or any bank-notes of this State, or of any other State, &c., or any drafts or bills of exchange, without a broker's license first had and obtained, he shall be guilty of a misdemeanor, &c. Ib. 179. And Revised Code, p. 580. A tax of two hundred dollars shall be imposed on all brokers, or dealers in gold and silver coin, or bullion, or bank-notes, or bills of exchange, by buying or selling the same, &c. And the license shall only extend *to the county* in which the same is issued. Revenue Act, 2d Feb., 1857. New Code, p. 86.

The plaintiff, a foreign corporation, appointed an agent, and delegated to such agent power and authority to "deal and trade in," "use and invest," and purchase and sell money (which is gold and silver coin), bank-notes, checks and drafts, and bills of exchange, and all kinds of commercial securities, such as banks, bankers, and "*exchange brokers*" usually deal in. Jos. Brown was appointed agent to perform these "duties," and the bond sued on was taken by the plaintiff to secure the faithful performance of the duties of the "appointment." The plaintiff brings the case into court and seeks its assistance to enforce the contract. The bank itself is the principal, and creates such an agency by its own appointment.

A broker is an "agent" who is employed to negotiate sales between the parties for a commission which is called *brokerage.* 1 Story on Cont., § 344; Story on Agency, § 32; Parson's Mercantile Law, 139, and note. In the proper exercise of his functions he does not operate in his own name, but only as a middle man. His business consists (if an exchange broker) in negotiating exchanges, by *buying and selling,* &c. 1 Story on Cont., § 344. The statute says "dealing in" drafts, bills of exchange, &c., "by buying or selling the same." Hutch. Code, 179. If the corporation acted under a *license* as a broker

and agent, it could not appoint Brown as agent in its place. The license was a personal privilege, and confined to the county. To be a broker, and to acquire power and authority to deal in exchange by buying and selling the same, the authority and permission must be derived from the law, and has to be paid for.

How can the plaintiff take a valid bond to secure "the duties" of such an "appointment"?

Brown's principal business consisted in dealing in exchange by purchasing bills on New Orleans and Mobile with the bank bills of the plaintiff and as the agent of the plaintiff, and in selling checks on New York, &c., and in exchanging and bartering bank-notes, and in discounting bills generally.

He was, in fact, a bank, banker, and exchange broker all together.

A mere *banking* corporation has no legal capacity to engage in the *brokerage* business; or any authority under the charter, which is the law of its creation and existence, to take out a license for that purpose. It would have just as much right to take out a license to keep an inn or tavern, or to retail wines and spirituous liquors. Its powers are all delegated, and are to be strictly construed.

And a corporation cannot do indirectly what it has no power or authority to do directly, and a fraud upon a statute is a violation of the statute.

8. The bank had no legal capacity to take such a bond as the one sued on. The charter confers no such power or authority. The bond purports upon its face to have been executed and taken in the State of Mississippi. By the charter no less than five directors shall constitute a board for the transaction of business, of whom the president shall always be one. The board of directors are not vested with power to appoint any such officer or agent. The "duties" and "appointment" mentioned in the bond are unknown to the charter, and the directors could not reqire or take security for the performance of the duties of such an appointment. It is not an official bond or the like. No such agency or office is created by the act of incorpora-

tion.  The State of South Carolina could not have conferred any such authority without the consent, express or implied, of this State.  The bond is a contract, and the plaintiff must show that the laws of its creation gave it authority to make such contracts.  Angell & Ames on Corp. § 273 ; 13 Peters, 587.

Corporate powers beyond the limits of the State conferring them cannot be deduced from private individual right.  *Slaughter* v. *The Commonwealth,* 13 Grattan, 773.

A county treasurer has no right to *take a note* of a licensed retailer for the amount due by him for his license, and such contract is absolutely void.  *Newson* v. *Thigpen,* 30 Mississippi Rep. 414.   Angell & Ames on Corp. §§ 256, 260, 259, 273 ; 1 Leigh 485 ; 3 Wendell, 482.

And where, by a bank charter, the power of discounting notes and bills was vested in the board of directors, it was held that they could not delegate this trust to an agent or agents of the board.  It would be a violation of the charter.  Angell & Ames on Corp. § 277; 13 New Hamp. 532 ; 26 Wendell, 485 ; *Percy* v. *Millanden et al.* 3 Louisiana Rep. 568; 6 Paige, 497 ; *Tippetts* v. *Walker et al.* 4 Mass. Rep. 595.

If the half cannot be delegated, how can a bond be taken to receive the due performance of such delegated authority ?

The boards, so constituted, are the statutory *agents* of the corporation, and derive all their authority from the charter.   Angell & Ames on Corp. § 279, and cases cited 2 Johns. Rep. 109.

And where a board are constituted agents of a corporation for particular purposes, and the number necessary to be present at the doing of an act is therein specified, an act done, or a contract made, by less than, or others than, those specified, will not bind the company.   Angell & Ames on Corp. § 291 ; 12 Mass. 185 ; 7 Cowen, 529, 530.

It must follow, therefore, that the bank had no authority or legal capacity to take the bond in question from Jos. Brown and his securities.

A *board* of directors were the legally constituted agents of the corporation for the transaction of business, to consist of thir-

teen stockholders; not less than five, including the president, could constitute a board for the transaction of any business.

9. The defendants are sued as *sureties*, and a *surety* has a right to stand upon the *very terms* of his contract ; nor can his liability be extended *by implication.* 29 Alabama, 165 ; 9 Wheaton, 680 ; 3 Binney, 520 ; 12 Wendell, 126 ; 5 Cond. U. S. Rep. 727 ; 5 Alabama, 591 ; 15 Peters, 208, 209 ; 2 Leigh. 647 ; 5 Gill & Johns. 315 ; 10 Johns. 586 ; 39 Maine, 188 ; Burge on Suretyship, · 40, 42, 48, 49, 50, 51.

The extent of the liability to be incurred must be expressed by the surety, or necessarily comprised in the terms used in the obligation or contract. Burge on Sur:, 40. Where a sheriff was commanded to collect money, the sureties on his bond were held not to be liable for " Alabama currency " collected by him. *Brown* v. *Moseley el al.* 11 Sm. & Mar. 354 ; 10 Missouri, 561 ; 6 Rand. 204 ; 29 Ala. 165 ; 11 Gill & Johns., 382 ; 23 Mississippi, 183 ; Angell & Ames on Corp. § 320.

The obligation of the surety is not to be extended to any other subject, to any other person, or to any other period of time than is expressed, or necessarily included in it. Burge on Sur. 40, 41. Or to any other place. Burge on Sur., 48, 49 ; 31 Alabama, 76.

And in construing the powers of an *agent,* the rule is, that general words are not to be construed at large, but as giving special powers for carrying into effect the special purposes for which they are given. So words " any and everything, or act," relative to the business of the appointment, are not to be construed to confer new and substantive power. Edwards on Bills, &c., 86, 87 ; 4 Peters, 172, 171, 152 ; 8 Wendell, 494 ; 3 Hill, N. Y. 281 ; 2 Peters, 661, 662 ; 2 Pick. 235, 231, 232 ; 31 Alabama, 83, 84 ; 16 ib. 28 ; Angell & Ames on Corp. § 322 ; Story on Agency, §§ 62, 63, 64, 65, 68, 69, 71 ; 12 Alabama, 252 ; 1 ib. 565 ; 2 ib. 718 ; 10 ib. 386 ; 1 ib. 446.

And the same rule applies to construing the *powers of a corporation.* 4 Peters, 152 ; 31 Alabama, 76.

So that in the present the very strictest construction has to be resorted to, for we have to deal with *a corporation, an agent*, and *a surety*.

The *fraudulent concealment* of the nature of the agency, also, avoids the bond as to the sureties. 2 Story on Cont. §§ 870, 871, and authorities cited; Chitty on Contracts, 459 (Perkins' Amer. ed. 1); 36 Maine, 179 ; 2 Amer. Leading Cases, 432.

And any alteration made in relation to the contract of the surety, without his consent (although for his benefit), either in the terms of the original agreement or in the mode of performing it, will exonerate him from liability. 5 Alabama, 591; 6 Wendell, 236 ; 9 Cowen, 128 ; 8 ib. 171 ; 2 Pick. 234 ; 2 Story on Cont. § 868 ; Burge on Sur. 214, 215, etc.

The declaration in the present case seeks to enlarge the liability of the sureties, and by the force of averment to charge them beyond and outside of the stipulations and terms of the bond, and of the authority conferred by the charter.

It introduces another bond between other parties, and raises and presents an issue as to whether the bond sued on is " additional and cumulative security," as alleged. The bond professes on its face to be a separate, distinct, and independent obligation. It refers to no other, and is not predicated upon any other bond. It must stand or fall upon its own merits.

The declaration enlarges and extends the undertaking of the security, and the force and effect of the bond from " *Smithville*," the place stipulated for in the obligation and expressed in the contract. This is very material. It is the very essence of the undertaking. The agency was *located at Smithville*, and the bond recites that Brown had been appointed " at the town of Smithville, Monroe county, and State of Mississippi," and by the condition of his appointment was to give good security for his conduct, and the condition of the bond is that Brown, as *such agent*, shall discharge " the duties of *said appointment.*" If Brown could act as agent beyond and outside of Smithville, then there is no limit to his powers as to place, or to the sphere of his operations. He might operate in South Carolina, or in the town of Newberry itself—could act anywhere and every-

where, and there would be no limitation upon his authority except his own discretion. The securities resided at or near Smithville, and could have an eye upon the manner of conducting the agency *there*, and *the place* is the most material part of the limitation of the undertaking of the surety. The securities never supposed that Brown was to have as large a charter as the wind. The bond specified and stipulated *for Smithville*, and expressly restricted the agency to that town. The obligation of the surety is to be strictly construed, and cannot be extended by implication. The agency was *special* as to place, and not general, and the security has a right to stand on the very terms of his contract, and his obligation is not to be extended as to place any more than to any other subject, to any other persons, or to any other period of time than is expressed or is necessarily included in the words used. Burge on Sur. 40, 42. " So where the condition of a bond given by the surety of the defendant, a bailiff, which recited that the sheriff had appointed the defendant bailiff of a hundred within his county, was declared to be, that the defendant should execute all warrants to him directed, it was adjudged that the words ' all warrants ' should be intended to be only all warrants which were directed to the defendant as bailiff of the said hundred, and not other warrants." Burge on Suretyship, 48.

Why make any limitation at all, or why specify any place, if the power was general? Why appoint Brown agent *at Smithville*, if he was to be agent at large ? The express mention of the town of Smithville is a direct exclusion of all other places. Suppose that the bank had as many agencies as it had directors, located in as many different towns and States, could each agency operate and conduct business in every other town and State, and at all the other local places and agencies as well as its own ? Why locate Brown in Mississippi and make him an agent for a *particular town* in that State, if it was intended, or understood, that he was not to be circumscribed as to limits ? Could the corporation itself operate " everywhere " or delegate such an authority as principal to an agent ? If we go outside of and beyond " Smithville " of the obligation, there

is no stopping-place. The fact is, Brown did not confine his immense operations to the obscure town of Smithville, in a remote corner of Monroe county, and therefore the attempt in the declaration to enlarge the area of his authority.

And proceeding upon the same principle, the declaration attempts to charge the sureties with, not only what came into Brown's hands and care anywhere and everywhere, even at the town of Newberry, South Carolina, but for all the *effects*, etc., of the bank "*subject to his order and control.*" He could operate at Iuka and Memphis, in Tennessee; Tuscumbia, in Alabama, Mobile, New Orleans, "New York," etc. If the bank, in violation of its charter, chose to subject its effects and assets to Brown's "order and control," the bond does not, and could not, cover any defalcation arising therefrom.

It is further attempted to hold the securities liable for Brown's conduct "*in sending*" everything under his control and management to South Carolina to the bank there. They are made *insurers by the way*.

The declaration, also, assumes that the sureties are responsible for the safety and solvency of all the bills, notes, paper, checks, commercial securities and other evidences of debt, that Brown dealt and traded in, and for all the "investments" he made, etc. The bond purports to have been executed in July, 1857, and it is a matter of public history that the great panic and commercial crisis of 1857 came off in the latter part of the same year. The Bank of Newberry and the other banks suspended, and it is now attempted under this bond to make the sureties *guarantors* of everything Brown operated in. This is the way the losses occurred, and is the origin of the whole difficulty. The breaches are made general so as to cover all these matters. It is sought to make the securities responsible for the insolvent paper, as some of it ultimately proved to be, *discounted and purchased by said Brown as agent*. The securities never agreed that the agent was to discount or deal in bills, commercial securities, checks, bank-notes, etc., or money, or that he was to perform any such extensive and various "duties" as are set out in the declaration, or that he

was to "*use*" or "*invest*" the funds of the bank. The bond, when examined, requires of Brown no such "*duties*," and the charter imposes none such. The bond does not covenant for any active duties on the part of the agent, and requires none such of him. The condition is, that he was faithfully to discharge "the duties of the said appointment" at Smithville, and to "account for all the *moneys, goods,* and *choses in action*" "belonging to" the bank, and *which it may be accountable for, which* shall come to the *hands or care* of said Joseph Brown, *agent,* and shall, when required, *account for, pay over,* and *deliver* to the said bank the *said money, goods, etc.,* and shall *indemnify and save harmless* said bank for all "*damages*" said bank shall sustain by reason of any act, error, or neglect of said Brown, and shall fulfil all *the trust* that shall from time to time be *reposed in him as* such *agent.* That is all. And what does the condition amount to? There is no authority in the bond to "discount," "purchase," "use and invest," deal and trade in "the money, bank-notes, bills, checks, commercial securities," etc., set out in the declaration, or any *guaranteeing* all such transactions, or the like. It is not an official bond. The charter establishes no such agency, appointment or duties. They are nowhere to be found in the act of incorporation, in the laws of the land, or in the obligation sued on. What are the *duties of the appointment?* Where are they written? To be binding they must be written somewhere, and if written, have to be affirmatively shown by the corporation. The corporation must show that the laws of its creation gave it authority to make *such contracts* through *such agents.* 13 Peters, 589, 587; Angell & Ames on Corp., § 273. There are no such "trusts"—no such duties—no such agency—except in the declaration of the plaintiff. The plaintiff must show that the law of its creation authorized all these trusts and duties.

Even on an official bond the obligation is only co-extensive with the *official* duties. 2 Brock. Rep., 98; 5 Peters, 386, 388; 10 Missouri, 560; 29 Alabama, 148, 165.

And if an office has no legal duties, a bond to perform its

duties generally could create no legal obligation. *United States* v. *Maurice et al.*, 2 Brock. Rep. 103.

And a contract can have no obligation in a legal sense, unless there be a law to ascertain and fix its obligation. *Farrar & Brown* v. *United States*, 5 Peters, 386.

The declaration, under the necessity of trying to show some consideration to support the contract, states that Brown "became entitled," by virtue of holding such an "appointment," to "certain fees, rewards, and pecuniary emoluments;" but when, where, and how, is not shown. The charter gives none —the law none—the bond none. Whence, then, entitled?" And when, where, and how, were the duties prescribed, where recorded, and how are they to be ascertained? The authority must be set out. The declaration merely says that "*it was the duty* of said Brown, as such agent, to take charge of all moneys, bank-notes, credits, and evidences of debt, to *be sent him or placed to his control or order*, and with the same purchase bills of exchange, promissory notes, and other negotiable commercial securities in which banks, bankers, and exchange brokers usually deal, and *to send the same* and account therefor to said bank, and to *invest* the same, etc. How it became the duty of the agent, we are not advised.

The bond confines the obligation to the "*case of*" "money," "goods and choses in action," belonging to the bank, etc. No goods are claimed, and the charter expressly prohibits dealing in "goods," as well as bank-notes of other banks, etc. The declaration seeks to hold the obligor liable for *money and bank-notes.* The bond limits the obligation to "*money.*" A "chose in action" is a thing incorporeal, a right, and is not assignable, and cannot be dealt and traded in.

"Money" is gold and silver coin, and does not include *bank-notes,* bills of exchange, checks, or promissory notes, or other commercial securities. And the stipulation is, that Brown is to *take care of* the money, goods and choses in action, and to *account for* the same; not that he is to "use and invest," "deal and trade in," "or discount or purchase" the same. The general words "duties" and "trusts" are not to be construed at

large.   And they mean nothing unless the charter and the law create and establish them, and fix and ascertain the nature and extent of the obligation.   The extent of the liability of the surety must not be left to inference or conjecture, but must be expressed by, or necessarily included in, the terms employed to bind him.   Smithville wholly ignored.

The breaches are general, uncertain, double, defective and insufficient.   They do not show in what distinct, separate, or special manner any loss or damage occurred, or when, or where; or the nature or character or the extent of any particular loss; or whether the misconduct of the agent consisted in discounting and purchasing any and what bill or bills of ex-change, promissory notes, checks, etc., or in investing or using the same, or in dealing in the same, or when or where the same was done; or which claims and how many claims were worthless; or any particular act or fact set forth with legal certainty, particularity and precision, as to time, place, amount, quantity, kind, conduct, etc.; but the declaration *groups toge-ther* a mass of general charges stated collectively and indef-initely so as to make it impossible to narrow down the issue to any particular, distinct, or certain point.   The breaches are double and multifarious and vague, after this fashion : That after the execution of the bond, and before the commencement of the suit, there was from time to time placed by the said plaintiff in the hands of said Brown, *or subject to his order and control*, as such agent, sums of money, bank-notes, credits, checks, and other evidences of debt, and commercial securities, *to the amount and value, in all*, of six hundred thousand dollars, etc., and so on throughout the whole declaration.   I knew of a brother who was arraigned before the church upon an indict-ment containing several counts (speaking after the manner of men), and the first count was to this effect, viz. : " Charge 1st, Specification 1st : A great looseness of morals and a general deviation from a godly walk."   This declaration seems to have been framed in the same style of pleading, and yet the learned counsel cannot look upon the pleas of the defendant with any composure at all, and takes issue only on six out of twenty-nine.

We submit to the court that any one of the pleas is better than the declaration. We cannot undertake to argue them. We were compelled to plead specially, and endeavored to present single, distinct, and intelligible issues. We expect to prove the facts set out in each and every plea. At this time we are more fully in the possession of the facts than we were at the moment when the pleas were prepared, and could considerably improve those that set up *fraud, covin, concealment, suppressio veri, suggestio falsi*, etc.

The pleas may be classified under the following general heads, viz.:

Nos. 1, 2, and 3, are pleas of *non est factum*, and are sworn to, the 3d being a special plea of *non est factum, resting for its efficacy in fraud*, in the execution and perfecting of the instrument.

Nos. 4 and 5.—Want of a valid and legal consideration.

Nos. 7, 8, 9.—Want of legal capacity and power, and violations of the charter.

Nos. 10, 11, 12, 13.—Fraud upon, and a violation of, the statute against unauthorized banking in this State.

Nos. 14, 15.—Fraud upon, and a violation of, the statutes in relation to brokers.

Nos. 16, 19, 20, 21, 22.—Fraud, concealment, *suppressio veri*, &c.; and a fraudulent alteration of the contract, &c., and fraud against the revenue act, Feb. 2, 1857.

Nos. 17, 18, 23, 25, 26.—That Brown was no longer *agent;* that he did not commit the breaches as *such* agent; that he did not commit them *at Smithville, as such agent;* that he was not acting as *such agent as is specified in the bond,* performing *such* duties, and *such* trusts; and that he did not as *such agent at Smithville,* have the " care and possession of " (according to the terms of the condition of said obligation) any *money*, goods, or choses in action; and did not fail or refuse to *account.* Each plea raising a separate and distinct issue and narrowing the issue to the bond, and confining the agency *to Smithville.*

Nos. 24, 27, 28.—Pleas of performance, &c., varying them to suit the bond.

12

No. 29.—Is a plea of payment and bill of particulars.

Some of the pleas were intended to force a demurrer, so as to reach back to the declaration; but most of them present substantial defences, and a complete bar to the action. The main questions of law that the pleas present, arise upon the declaration, except those as to fraud, concealment, alteration of the contract, &c.

In support of the third plea, which is sworn to, and an important one, we would remark that it is a special plea of *non est factum*, setting up that the instrument was delivered by the sureties to the principal obligor, as an *escrow;* that the condition was never complied with; and that the plaintiff *fraudulently obtained the possession of the same,* and that, in fact and in truth, *it never was delivered.* The plea rests for its efficacy in fraud, in the execution and possession of the bond. A plea may present many and different facts and circumstances tending to show a particular issue, and not be double. We consider the plea sufficient in both form and substance. If the substance is there, and it is not formally pleaded, it may readily be amended.

If a bond is signed on condition that it is to become obligatory upon the performance of some act by the obligee, or any other person, the paper signed does not become the bond of the party signing the same until the condition precedent has been performed. 3 Wendell, 380, 381; 3 Alabama, 88, 91; 2 Leigh. 157; 2 Dev. Rep. 291; 19 Eng. Com. L. Rep. 475; 6 Howard Miss. Rep. 173; 10 Sm. & Mar. 23, 24.

It is essential to the validity of the bond that the form and the sureties are approved, and that it be accepted, before it can have any effect as a contract. 19 How. U. S. Rep. 76; 15 Wendell, 658; 7 Pick. 91; 6 Cowen, 617, 618; 6 Wendell, 669; 4 Dev. 384; 20 Pick. 28; 7 Greenleaf Rep., 81: 23 Wendell, 45.

And a bond may be delivered conditionally as an escrow to a *co-obligor*, or any other person than the obligee, and will not be operative as the deed of the party, until the condition is performed. 29 Alabama, 160; 3 ib. 88, 91; 6 Howard Miss. Rep. 123; 5 Ala. 65; 11 ib. 466; 3 Wendell, 380; 4 Barn. & Adolph, 440; 11 Vermont, 440; 4 Cranch, 219; 11 Peters,

86 ; 2 Harrington, 396 ; 4 Florida, 359 ; 7 Ohio, 54 ; 10 Ohio, 198 ; 2 Leigh. 157 ; 12 Leigh. 479 ; 17 Johns. 196.

In *Graves et al.* v. *Tucker*, 10 Sm. and Mar. 11, 22, 23, the plea of the two sureties was that they delivered the bond to Graves, the principal obligor, as an escrow, and issue was taken and the case tried on the plea. In that case the court, in commenting on the evidence for a new trial, say that the deed must be delivered to one that is a stranger to it, and not to the party himself to whom it is made. Certainly; but any one but the obligor himself is a *stranger* until the obligee receives and accepts the deed. This plea was drawn with special reference to the Graves case, 10 Sm. and Mar. 21.

The demurrer was sustained to the plea in that case because it was a plea of an escrow, and did not aver that the parties executed upon any condition whatever, and because the principal obligor and not the creditor was guilty of fraud. The knowledge or assent of the creditor was not shown. This plea is precise in assuming both of these facts. See 10 Sm. and Mar. 21, 22 ; *Goff* v. *Bankston*, 35 Mississippi, 518. This declaration alleges that the bond was signed, sealed and delivered on the 24th day of July, 1857, at Monroe county, in the State of Mississippi, and was then and there accepted. The plea denies these facts *specially*, and shows that the bond was not so signed, sealed and delivered, or accepted ; but, on the contrary, shows that the paper was only signed as an escrow, handed to the principal obligor on condition, &c., and that long after it bears date, the plaintiff fraudulently *obtained possession* of the paper at Newberry, South Carolina, from the principal obligor, without the knowledge or consent of the defendants, and that the plaintiff refused to accept it on the condition in which it was signed, but fraudulently procured possession upon some *secret*, *other*, and *different* arrangement, and in fraud of the rights of the sureties. That we think a valid and substantial defence to the action, and that the plea is sufficient in both form and substance. The object is to show that the bond was not executed in manner and form as alleged, but that the plaintiff *actually refused to accept it*, and fraudulently and secretly

obtained possession by *some* clandestine arrangement concealed from the sureties; it matters not what.

The date of a deed is only presumptive evidence of the time of delivery, and is utterly repelled if it appears on the proofs that the instrument continued in the hands of the grantor *after its date*. 16 Barbour, 264; 1 Denio, 263; 5 ib. 290.

The bond in this case bears date on the 24th July, 1857, and never came to plaintiff's possession until 9th October, 1857; yet it is attempted to make the sureties liable for all the intermediate breaches of the condition of the bond. That the bond was delivered and accepted is very material, for *until then* the liability of the sureties could not attach.

ELLETT, J., delivered the opinion of the court.

This action is founded on a penal bond, given by Joseph Brown, as principal, and the other defendants as his sureties, dated July 24, 1857, in the penalty of $40,000, with the following condition: "Whereas the above bounden Joseph Brown, having been duly appointed agent of the said bank at Smithville, Monroe county, and State of Mississippi, is, by the condition of his appointment, to give good and sufficient security for his conduct: Now the condition of this obligation is such, that if the above bounden Joseph Brown shall and do well and faithfully discharge the duties of the said appointment during all the time that he may continue therein; and shall well and faithfully account for all the moneys, goods, and choses in action belonging to the said bank, or which it may be accountable for, which shall come to the hands or care of the said Joseph Brown, agent; and shall, whenever required, faithfully account for, pay over, and deliver unto the said bank, their certain attorney, agent, or order, the said moneys, goods, and so forth; and shall indemnify and hold harmless the said bank from all damages and loss which the said bank may incur or become liable to pay, by reason of any act, error, or neglect of said Joseph Brown; and shall fulfil all the trust that shall from time to time be reposed in him as such agent, then this obligation to stand void, or else remain in full force and virtue."

The declaration alleges that Brown had been appointed to the agency, and had given bond to the like effect in the year 1855, and had received from the bank, as such agent, large sums of money to be invested by him, as agent, in bills of exchange, checks, and other commercial securities, for and on account of the bank; and being desirous of receiving further sums for the same purpose, and of continuing the agency, he executed, on the requirement of the bank, the bond now sued on, as additional and cumulative security; and that he was entitled to certain fees, rewards, and pecuniary emoluments for his services.

It is averred also, that it was the duty of said Brown, as such agent, under said appointment, to take charge of all moneys, bank-notes, credits, and evidences of debt, to be sent to him, or placed subject to his control or order, and with the same purchase for said bank, good, solvent, and available bills of exchange, promissory notes, and other negotiable commercial securities, in which banks, bankers, and exchange brokers usually deal; and to send the same and account therefor to said bank, or to its order or credit, as desired; and to return and properly account for all moneys, bank-notes, credits and evidences of debt that might remain uninvested; and to indemnify and save harmless the bank from all loss or damage by any act, error, or neglect of said Brown, as agent.

The declaration further alleges that after the execution of the bond sued on, the bank placed in the hands of said Brown or subject to his order or control, as such agent, large sums of money, bank-notes, checks, credits, and other evidences of debt, and commercial securities, to the value of $600,000, to be used and invested by said Brown, as such agent, in the discounting and purchasing for and on account of said bank, of good, solvent and available bills of exchange, promissory notes, checks, and other commercial securities and evidences of debt, such as banks, bankers, and exchange brokers usually deal in; and assigns four breaches of the condition, to wit:

1. Failure to pay over, or account for, the money and securities in his hands.

2. Failure to invest in good securities, and purchasing such as were insolvent and unavailable.

3. Refusal to deliver to plaintiff such good, solvent and available securities as were discounted and purchased by him, or to account for the same.

4. Failure to indemnify the plaintiff against certain bills of exchange discounted by him as agent, and which were protested, and taken up by plaintiff; and failure to indemnify against the expenses of such protests.

To this declaration the defendants pleaded twenty-nine pleas, many of which are utterly frivolous, and only calculated to confuse, embarrass and delay the cause, and to obstruct a fair examination of its merits. The whole defence relied on could have been made under the plea of *non est factum*, or might have been presented in a single special plea. Indeed the defence was finally made by extending back the demurrer of the plaintiff to his own declaration, without any serious effort to support the great mass of the pleas.

The tenth, eleventh, twelfth, and thirteenth pleas set forth, with slight variations, that the agency of Brown was created, in violation of the laws of Mississippi on the subject of banking, for the purpose of employing part of the effects of said bank in making discounts of paper, and carrying on the business of banking in this State; of issuing in this State, and putting in circulation here, its notes; and of keeping an office in this State, for the issuing of its notes for circulation as money; and that all these things were done by Brown, as agent, under said appointment, and that the bond was required from Brown to secure the performance of these acts, all which it is insisted were illegal.

These four pleas were among those demurred to, and upon the facts therein stated the material question in the cause arises.

Notwithstanding the apparent effort to cover up and conceal the true character of the proceeding, by the use of general and indefinite phraseology in the condition of the bond, the declaration itself sufficiently shows that the object of the plaintiff was to establish an agency, and to open an office, in this State, for

the purpose of carrying on the business of banking, by discounting notes, loaning money, and buying and selling checks and bills of exchange. The averments of these pleas put the matter beyond the possibility of doubt, and show further what was inferable from the declaration, that the issuance within this State of the notes of the bank, and putting them in circulation here, was also a part of the arrangement. In effect, the transaction disclosed by the pleadings is, the creation, by a chartered bank of the State of South Carolina, of a branch bank in the State of Mississippi, and the transfer hither of a large portion of its capital, to be here employed by it in the business of banking; the inducements being the evasion of the restrictions of its charter on the subject of interest, and the putting out of its circulation at a point remote from the parent institution, where there would be no obligation to redeem it, and where time and expense would be required in order to present the notes to the bank for payment. The bond sued on, given to secure the faithful performance, by the agent, of all the duties involved in the execution of this scheme, was not valid unless the object of the appointment was itself lawful. It is not necessary to inquire whether it was valid by the laws of South Carolina. It is sufficient that, if given in the prosecution of a purpose to violate the policy or law of this State, and to secure the plaintiff against loss by the conduct of his agent in such unlawful pursuit, it must be held to be totally void.

The question then is, whether it was lawful, at the date of this obligation, for a foreign banking corporation to create such an agency in this State, and by such means to employ its capital here in the business of banking.

It is not necessary to speak of policy where the subject is regulated by positive statute law; but it would not be difficult, irrespective of the particular statute, to show that such a transaction was in violation of the settled public policy of this State.

The policy of the State of Mississippi in relation to the exercise of the franchise of banking within its limits, is clearly defined and established. Since the year 1837, no bank has

been incorporated in this State, and all such institutions, existing or authorized at that date, have been put out of existence. The disasters brought upon the people of the State, about that period, by their excessive multiplication, and the enormous expansion of the currency by means of their issues, led to the adoption of the most vigorous measures for their extermination. In 1840 the most stringent provisions were enacted for restraining the operations of the banks then in existence within proper and prudent limits, and for compelling the redemption of their notes in specie. In 1843 an act was passed directing informations in the nature of a *quo warranto*, to be filed, against all that had not complied with this act, or that had in any manner violated their charters ; and, under its operation, all the banks in the State were speedily dispossessed of their franchises, by judgments of forfeiture and ouster. This legislation is a true exponent of the policy of the State, and shows that since 1840, at least, the almost unanimous sentiment of the people has been adverse to allowing the banking system to obtain a foothold in our limits. During all this time the legislature has steadfastly resisted all efforts to induce a departure from this policy. The single exception found in the legislation of 1862, was indulged under very peculiar and pressing circumstances, as a supposed measure of relief, in an unprecedented condition of affairs ; and on the first opportunity it was obliterated from the statute book, and a return made to the policy that had been firmly persisted in for more than twenty years.

The final evidence of this policy is to be found in the provisions of the act of Feb. 15, 1840 (Hutch. Code, 328), "to prevent unauthorized banking," passed expressly to enforce it. The first section of this act provides that "no person, unauthorized by law, shall subscribe to, or become a member of, or be in any way interested in any association, institution, or company, formed or to be formed, for the purpose of receiving deposits, making discounts, or issuing notes or other evidences of debt, to be loaned or put in circulation as money ; nor shall any person, unauthorized by law, subscribe to, or become interested in any bank or fund, created or to be created, for the like

purposes, or either of them." The third section enacts that " no incorporated company, without being authorized by law, shall employ any part of its effects, or be in any way interested in any fund that shall be employed for the purpose of receiving deposits, making discounts, or issuing notes or other evidences of debt, to be loaned or put in circulation as money." The sixth section provides that " no person, association of persons, or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposits, or discounting notes or bills, or issuing any evidence of debt to be loaned or put in circulation as money, nor shall they issue any bills or promissory notes, or other evidences of debt, as private bankers, for the purpose of loaning them or putting them in circulation as money, unless thereto expressly authorized by law." The second, fourth and seventh sections impose appropriate penalties for any violation of these provisions ; and the fifth declares all notes, or other securities, discounted, or given for money loaned in violation of the first and third sections, to be void.

This act was continued in force from the period of its adoption until the first of November, 1857, when it was superseded by the Revised Code, which contains substantially the same provisions.

Banks are of three kinds, to wit : banks of deposit, of discount, and of circulation. An institution may be restricted to one, or may combine any two, or all, of these functions. So far as it was possible, the State of Mississippi has put the seal of her disapprobation upon the entire system. As long as neighboring states chartered banks, and allowed the manufacture and use of paper money, it was impossible absolutely to prohibit its circulation in this State without the most serious inconvenience. Accordingly the circulation of bank-notes, issued in other States, has not been prohibited; the eighth section of the act of 1840, being directed against a particular species of currency, known as " shinplasters," the character of which is well understood from that designation ; but the whole businesss of banking in this State, except by such banks as then existed, or might

thereafter be created, was absolutely prohibited.   The interdiction was intended to operate in this State upon all persons, natural or artificial, wherever residing or domiciled.   The exception created by the use of the words, "unauthorized by law," is only in favor of such institutions already existing as possessed these powers by virtue of charters granted by the legislature of this State.

The establishment of the agency or branch at Smithville, by the Bank of Newberry, was a palpable violation of the three sections above quoted from the act of 1840.   1. The bank did not merely subscribe to, and become interested in, an association, company, or fund, formed or created for the purposes condemned by the first section, but it constituted the company itself, and contributed the whole fund to be employed.   2. It employed its effects, and was interested in the fund used for the purposes prohibited by the third section.   3. And it kept an office for the purposes forbidden by the sixth section.   The bank was the guilty agent in the whole transaction.   The appointment of an agent to execute these illegal purposes, was itself illegal.   The bond sued on arises directly from, and is immediately connected with, the unlawful transaction.   It was contemporaneous with the renewal of the appointment, and it was taken with a view to bind the agent to perform the unlawful acts, and to secure to the bank the profits arising from it. The proposed violation of the law of this State was therefore the only consideration on which it was founded, and the consideration being unlawful the bond cannot be supported.

It is argued for the plaintiff that inasmuch as in 1857 the legislature laid a tax of " two per centum on bank paper of any other State, sent or brought into this State, by any corporation or individual issuing the same, for the purpose of being loaned, or put in circulation by way of loan or brokerage, or in the purchase of bonds, notes or bills of exchange," therefore it must be understood that the act of 1840 was not intended to prohibit the establishment of such agencies as that disclosed in this case.   That the act did import such a prohibition, we have already shown.   Repeals by implication are never favored, and

it does not at all follow, because the business was taxed, that it was intended to repeal the prohibition and legalize the proceeding. In fact, we think, the tax was resorted to only as a means of more effectually enforcing the prohibition. The enormous amount of it, with the consequent liability to county taxation likewise, shows that revenue could not have been expected to arise from it, and that prohibition must have been intended. It might as well be argued that the tax of one hundred per cent. levied on "unauthorized issues of paper money," by the act of January 3, 1863, was designed to take off the penalties against shinplasters, and to legalize their issuance.

It is also contended that that part of the bond, at least, which requires Brown to account to the bank for the money he received, was good, and that if one part is good, and can be separated from the bad, the whole will not be held void. But to bring the case within the rule invoked, the good matter must be entirely independent of the bad; for if the part that is good depends upon that which is bad, the whole instrument is void; and so if the good and the void consideration be so mixed, or the contract so entire, that there can be no apportionment. 2 Kent, 468. In this case there was but one consideration, and that was unlawful. The money and property sought to be recovered were placed in the hands of the agent for an unlawful purpose, and were used by him, in pursuance of his employment, in an unlawful pursuit; and to say that the bank can now recover, at law, the fruits and profits of the illicit venture, or the balance remaining in the hands of the agent at its close, would be to cover the whole proceeding with a legal sanction. This we cannot do.

The judgment of the court below carries out the views we take of the merits of the case, and will therefore be affirmed.