## ORVILLE H. TOBEY

*v.*

## CHARLES ROBINSON.

*Filed at Ottawa May 14, 1881.*

1. CORPORATION—*stock to person paying nothing.* Where a stock yard company was organized by the officers of a railway company and others, and the only means put into the same was by the railway company, through its officers, who also controlled the stock yard company, and the latter company issued stock to the extent of its charter, a portion of which was used as a corruption fund and the balance divided between certain members of the company, they paying nothing therefor, it was *held*, that the issue of the stock was in violation of law and in fraud of the rights of the stockholders of the railway company, and vested in the recipients of the same no rights which a court of equity would enforce or protect. The stock, if of any validity, belonged to the railway company.

2. CONTRACT—*founded on illegal consideration, not enforced.* Where the holder of a certificate of stock in a corporation, which had been issued to him without consideration and in fraud of the rights of others, surrendered the same to an officer of the company issuing the same, under an agreement that new certificates should be issued in lieu of the one given up, a portion of which was to be retained and used for the purpose of corrupting certain officials in the interest of the company, and the rest to be returned to such holder, it was *held*, that as the agreement under which the certificate was surrendered was illegal and void, the agreement to return to him the balance of such certificates could not be enforced, either at law or in equity.

3. Nothing is better settled in the law of contracts than that if any part of the consideration upon which a promise rests is illegal, the entire promise fails. But this is not true *e converso.*

APPEAL from the Appellate Court for the First District; —heard in that court on appeal from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

Mr. EMERY A. STORRS, for the appellant:

To show that the defendant, by his acts, was estopped from denying the legality of the contracts entered into between the railway company and the stock yard association, and that

he will not be allowed to claim any advantage to himself, derived from the illegality of transactions, the validity of which he has repeatedly asserted, and the full benefits of which he has reaped, counsel cited Herman on Estoppels, 461, 462, 469, 466; *Stephenson* v. *Newnham,* 13 Com. Bench, 302; *Bailey* v. *Bailey,* 44 Pa. 274; *Ullery* v. *Clark,* 18 id. 148; *Everhart* v. *Westchester and Philadelphia Railroad Co.* 28 Pa. St. 339; *Erie and Waterford Plank Road Co.* v. *Brown,* 23 id. 156; *Martin* v. *Ives,* 17 S. & R. 364; *Deford* v. *Mercer,* 24 Iowa, 118; *Phillips* v. *Rogers,* 12 Metc. 405; *State* v. *Van Horn,* 7 Ohio St. 327; *Cobb* v. *Dows,* 10 N. Y. 335; *Sherman* v. *McKeon,* 38 id. 266; *Wood* v. *Seeley,* 32 id. 105; *Bissell* v. *Michigan Southern Railroad,* 22 id. 258; *Smith* v. *Sheely,* 12 Wall. 358; *Turner* v. *Flannigan,* 1 Black, 491; *Furguson* v. *Landram,* 1 Bush, 548; *West* v. *Madison County Agricultural Board,* 82 Ill. 205; *People* v. *Sterling Manufacturing Co.* 82 id. 461; *McCarthy* v. *Lavasche,* 89 id. 270; *Hartshorn* v. *Patroff,* id. 509; *Chicago Packing, etc. Co.* 87 id. 547; *International Bank* v. *Bowen,* 80 id. 541.

Robinson can not now, when called upon to account for the property, the possession of which he has dishonestly and fraudulently procured, be permitted to set up a title hostile or adverse to that which he recognized when he received the stock.

A trustee can not set up a claim to the trust property adverse to the *cestui que trust,* nor can he deny the title. 1 Perry on Trusts, 521; *Van Huster* v. *Spengemann,* 2 Greenlf. Ch. 187; *Stone* v. *Godfrey,* 5 DeGex, M. & G. 85; *Neusom* v. *Flowers,* 30 Beav. 469; *Attorney General* v. *Monroe,* 2 DeGex & Sen. 163; *Kennedy* v. *Daly,* 1 Sch. and Lef. 381; *Sinclair* v. *Murphy,* 14 Mich. 292; *Osgood* v. *Nichols,* 5 Gray, 420; *Dervey* v. *Bell,* 5 Allen, 168; *Walden* v. *Karr,* 88 Ill. 51; *Prather* v. *Vineyard,* 4 Gilm. 40; *Eddy* v. *Roberts,* 17 Ill. 506; *Brown* v. *Straight,* 19 id. 89; *Bristow* v. *Lane,* 21 id. 194; *Russell* v. *Payton,* 4 Bradw. 478; Bigelow on Estoppels, 387.

Messrs. DEXTER, HERRICK & ALLEN, for the appellee:

The original issue and distribution of the stock, the subsequent surrender and redistribution, in pursuance of which the certificate claimed by the complainant was delivered to the defendant, and the entire transaction, of which these acts form a part, were tainted with illegality and fraud, and the court will not lend its aid to either party to consummate the transaction, or otherwise compel a division of the alleged profits. *Non oritur actio ex turpi causa. Neustadt* v. *Hall,* 58 Ill. 172; *Arter* v. *Byington,* 44 id. 468; *Miller* v. *Davidson,* 5 Gilm. 524; *Skeels* v. *Phillips,* 54 Ill. 309; *Craft* v. *McConoughy,* 79 id. 346; *Dunaway* v. *Robertson,* 95 id. 420; *Dunning* v. *Battherick,* 41 id. 425; *Bester* v. *Watham,* 60 id. 138; *Harris* v. *Hatfield,* 71 id. 300; *Blackburn* v. *Bell,* 91 id. 434; *Tamm* v. *LaValle,* 92 id. 263; *Tenney* v. *Foote,* 95 id. 99; *Holdman* v. *Johnson,* Cowp. 343; *Coppell* v. *Hall,* 7 Wall. 558; *Gregg* v. *Wyman,* 4 Cush. 326; *Tenney* v. *Foote,* 4 Bradw. 601; *Booth* v. *Hodgson,* 6 T. R. 409; *Simpson* v. *Bloss,* 7 Taunt. 246; *Gray* v. *Hook,* 4 Conn. 449; *Phalen* v. *Clark,* 19 id. 432.

The principle that the capital stock of a corporation must be paid for in money, or tangible property which shall represent that capital to the stockholders and creditors, and the public, is too well established to require an extended citation of authorities. We cite the following: *Sturges* v. *Stetson,* 1 Biss. 246; *Henry* v. *Vermilion and Ashland Railroad Co.* 17 Ohio, 187; *Fisher* v. *Railway Co.* 53 Barb. 513; *Gilman, Clinton and Springfield Railroad Co.* v. *Kelly,* 77 Ill. 426; Brice's Ultra Vires, 153; Field on Corp. sec. 126.

The capital stock of a corporation is trust property in the hands of the directors. *Gilman, Clinton and Springfield Railroad Co.* v. *Kelly,* 77 Ill. 426; *Ex parte Daniels,* 1 DeGex & Jones, 372.

The payment for stock by the use of the recipient's influence in favor of the corporation, is no payment, and stock issued for such a pretended consideration is wholly void.

*Sturges* v. *Stetson,* 1 Biss. 246; *Fisher* v. *Railway Co.* 53 Barb. 513.

Mr. HENRY L. BURNETT, also for the appellee, made an oral argument, in which he made the following, among other legal points:

Any effort to distribute stock without payment of its full par value is fraudulent. *DeRuvigue Case,* Law Rep. 5 Ch. Div. 306; *Ex parte Daniels,* 1 DeGex & Jones, 372; Brice's Ultra Vires, 153; *Fisher* v. *Railway Co.* 53 Barb. 513; *Gilman, Clinton and Springfield Railroad Co.* v. *Kelly,* 77 Ill. 426; *Knowlton* v. *Empire Spring Co.* 57 N. Y. 518.

If a contract is in part only connected with an illegal transaction, but grows immediately out of it, though in fact it be a new contract, it is equally tainted by the illegality of the transaction from which it sprung. *Gray* v. *Hook,* 4 Conn. 449; *Gregg* v. *Wyman et al.* 58 Mass. 322, and other authorities cited in preceding brief.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

By an act of the legislature of the State of New Jersey, David Allerton and six others were, on the 19th of March, 1869, duly incorporated by the name of the National Stock Yard Company. There was a meeting of the corporators on the 30th of the same month, at which Allerton was elected president. At a subsequent meeting, on the 3d of the following month, by-laws were adopted, a seal agreed upon, and a vice-president elected. By the act of incorporation, the capital stock was fixed at. $1,000,000, to be divided into 10,000 shares, of $100 each, and the principal business of the company was to be "the maintenance of yards and buildings for the keeping and accommodation of live stock, and generally taking care of, buying, selling and slaughtering animals."

The object of this organization was to establish and operate stock yards in connection with the Erie Railway Company, and the evidence tends to show that it was intended by the

promoters of the scheme, or at least a part of them, that the stock yard company, when formed and put in operation, should be a mere agency of the Erie Railway Company, to be used in the interest of the principal officers of the latter company, and such others as they might, from considerations of policy, deem proper to associate with them. The Erie Railway Company, at this time, was under the management of Jay Gould and James Fisk, Jr., the former being president and the latter vice-president of the company, and they at the same time had a controlling voice in directing the affairs of the stock yard company.

By reason of a misunderstanding having arisen between them and Allerton, with respect to the management of the latter company, through their influence and instrumentality a complete re-organization of the company was effected in the months of January and February, 1870, by which Allerton, and those acting in concert with him, were deposed, and others, who were in full accord with Gould and Fisk, placed in their stead.

Under the new organization, Oliver H. Tobey, John B. Sherman and Charles Robinson became directors of the company. Robinson was also elected president of the company, and a member of the executive committee that had the immediate management of the company's concerns.

In pursuance of the original arrangement, the necessary stock yards had already been purchased and improved by the Erie company at the terminus of its railway, at Weehawkin, New Jersey. This had all been done at the exclusive expense of the Erie company, and the title to the stock yards had been taken in the name of Gould, as trustee, for the purpose of conveying the same to the stock yard company upon the final consummation of the understanding between the two companies, and a deed to that effect had already been executed preparatory to delivery, though no delivery was ever made until after the new organization was perfected. Leaving out of view the utter disregard of

legal duty and moral obligation on the part of the projectors of the organization, they displayed the highest order of discernment and business skill in collecting together suitable material for the formation of the company, with a view of doing a thriving business. The plan of organization and operation, under the new management, was thoroughly digested and definitely understood.

The prominent feature in the scheme was to make the operations of the company highly remunerative to the few who were to be given an interest in it. To this end a combination was entered into in advance of the organization, by the officers of the Erie company on the one hand, and John B. Sherman, Charles Robinson, Milton Tabor and Oliver H. Tobey on the other, by which the latter were, upon certain terms, which were subsequently carried into effect, to identify themselves with the organization, or contribute their influence to the promotion of its objects and purposes. Sherman, at that time, was president of the Union Stock Yard Company of Chicago, a position wholly incompatible with the relations which he assumed to the National Stock Yard Company. Tabor was a resident of Chicago, and had been an extensive shipper of stock, and had a large and influential acquaintance with other shippers. Tobey was at that time, and had been for a number of years, an extensive shipper of live stock over the Erie railway. Robinson also had great experience in the shipment of stock, and was extensively and favorably known among stock shippers, and was also on the most intimate relations with Sherman, by means of which it was doubtless expected he would exercise a wholesome influence over the latter in controlling a large proportion of the shipments of stock from the west.

In pursuance of this preconcerted plan and definite understanding, the reorganization of the company was effected in the manner already stated. In further execution thereof, without a dollar of the one million of capital stock authorized by the charter to be issued having been paid in or sub-

scribed, and without the corporators, directors, or any one else, on behalf of the company, assuming any personal liability therefor, Jay Gould, acting on behalf of himself and the Erie Railway Company, completed the transfer of the stock yards to the stock yard company, by delivering to it the deed theretofore made by Gould, and at the same time advanced to it $100,000 in cash, for the purpose of making additional improvements and increasing the company's business facilities.

The stock yards and property conveyed by Gould were estimated at $525,000, which, added to the $100,000 advanced in cash, made a total of $625,000. The whole of this sum was secured alone by the bonds of the company and a mortgage on the property conveyed to it through Gould by the Erie company. At the same time, the Erie company, through its officers, entered into certain contracts with the stock yard company, running a period of twenty years, and conferring upon the latter company exclusive and valuable privileges for which the Erie company was to receive no adequate equivalent. Indeed, a mere glance at these contracts shows, beyond all question, they were made in the interest of the stock yard company, and there is little, if any, room to doubt they were so intended. In further consummation of the scheme, by a vote of the directors, the executive committee was directed to issue $1,000,000 of 'stock, being the full amount which the charter authorized to be issued, $400,000 of which was, by the further order of the directors, to be equally divided between Sherman, Tobey, Tabor and Robinson, and the remaining $600,000 to be delivered to Fisk.

This stock was issued and delivered, as directed, to Sherman, Tobey, Tabor and Robinson, each receiving a certificate for 1000 shares, of $100 a share, for which, as we view it, neither of them paid a cent, and its issue was in violation of law and in fraud of the rights of the stockholders of the Erie company. If the testimony of some of the witnesses is to be believed, a considerable portion of the

stock given to Fisk was used as a corruption fund in the interest of the stock company, and from the admitted facts in the case we have little if any room to doubt that it was so used.

After the distribution of the stock in the manner we have stated, appellant testifies, in substance, that Robinson and Sherman came to him, and represented that it was desirable for the interest of the company to secure the influence of certain parties, among whom was mentioned Judge Barnard, and that the company did not have the necessary stock to use in accomplishing that object, and that it was thought best that those who had received certificates for 1000 shares of the stock should, respectively, contribute 200 of these shares, to be distributed among the persons referred to for the purpose suggested, and that they, Robinson and Sherman, had determined to so contribute of their shares for that purpose; that upon these representations, and the distinct understanding that a certificate of 800 shares was to be returned to him, he surrendered to Robinson his original certificate for 1000 shares.

It is an admitted fact that this certificate of Tobey, together with the other three, for 1000 shares each, was delivered to Robinson, and were cancelled, and other certificates of different denominations, but amounting in the aggregate to the 4000 shares, were re-issued, four of the re-issue being for 800 shares each, and it is claimed by appellant that the cancellation of his original certificate, and the re-issue of others in its stead, in the name of Robinson, was without his authority or consent. It further appears, that the most of this re-issue of stock in Robinson's name, on account of that surrendered by appellant and others as just stated, was subsequently, in 1875, surrendered by Robinson to the Erie Railway Company in compromise of certain litigation growing out of his management as president of the stock yard company. Robinson has never, in any manner, accounted to Tobey for the 800 shares of the stock which Tobey claims he was to

have returned to him. On the contrary, he denies altogether that he ever agreed to return the certificate, as claimed by Tobey, or any part of it. He further alleges that the latter never had any beneficial interest in the stock; that while it was issued in Tobey's name, he received it, and agreed to hold it in trust for Allerton, the former president of the stock yard company, to whom it really belonged; that the stock, through the management of Fisk, was issued to Allerton in this way in order to conceal from Gould Allerton's interest in the re-organized company, with whom Gould, at that time was on bad terms; that with the knowledge and approval of Allerton, the stock was returned to and cancelled by the company.

The present bill was filed by Tobey against Robinson, to recover the proceeds of the certificate of stock in question, which it is claimed the latter has appropriated to his own use. Upon a hearing in the circuit court a decree was rendered dismissing the bill, and that decree was affirmed by the Appellate Court, and the present appeal is prosecuted to reverse the judgment of the latter court.

The record in this case is voluminous. The evidence has taken a wide range. The abstracts are unusually large, and the arguments of counsel alone would make a volume of many hundred pages. Indeed, the case has been literally overwhelmed by the very learned, elaborate and exhaustive arguments of the eminent counsel engaged in the cause. And while we have been highly entertained and greatly aided in our labors during the several days we have spent in reading them, we can not, in the view we take of the case, repress the conviction that much of what we have considered might safely have been omitted without at all affecting the result.

Stripping the case of all its colors and plumage, and brushing away the thin and transparent gauze which some of the witnesses have thrown over it with the view of covering up its real and true character, we find but little in it about which there is any just ground for controversy. The case is

simply this:   The officers of the Erie Railway Company, con-
federating with appellant, appellee and others, entered into
a conspiracy for the express purpose of amassing fortunes for
themselves at the expense of the Erie company.   In execu-
tion of this unlawful enterprise an organization was effected,
according to the forms of law, under an existing charter from
the State of New Jersey, which assumed to act as a corporate
body, by the name of the National Stock Yard Company.   The
so-called company was officered from and otherwise placed
under the exclusive control of the conspirators.   Upon the
company being thus organized, the officers of the Erie com-
pany transferred to it, without any security whatever, except
such as the property conveyed afforded, property and money
amounting in the aggregate to $625,000, and the conspirators
at once issued to themselves, in the name of the company,
$1,000,000 in stock, being all that could be issued under the
charter.   In this hasty divide of the spoils, appellant and
appellee, both being officers of the company, respectively
received a certificate for 1000 shares, amounting at their
par value to $100,000 each.   Like certificates were issued
to two others of the conspirators at the same time.   A
short time afterwards, and before any disposition had been
made of these certificates, the conspirators concluded their
interests would be promoted by using a portion of this stock
which they had issued to themselves as a corrupting fund, to
secure the favor of certain prominent officials, and it was
accordingly agreed that the four certificates issued for 1000
shares of the stock, each, should be surrendered to appellee,
as president of the company, out of each of which he was to
use 200 shares for the purpose in question, and return the
residue to their respective owners.   In pursuance of this
arrangement, Robinson obtained possession of all four of these
certificates, including that of appellant, but upon the express
promise on his part that he would return to them, respec-
tively, the 800 shares not required for corrupting purposes.
This scheme for debauching certain officials, which led to

the surrender of these certificates of stock, took in its range persons of high official and social standing.

The evidence, by a decided preponderance, in our judgment, establishes the fact that the certificate for which this suit is brought was surrendered for the express purpose of corrupting Judge Barnard, a member of the Supreme Court of New York. Indeed, this is, in effect, admitted by appellant in his own testimony. Appellee having used a part of it for that purpose, finally surrendered the residue to the Erie company, which alone had the right to receive it, and now refuses to account to appellant for it. Hence this suit. Or, differently stated, appellee and appellant having fallen out about the division of the proceeds derived from an unlawful enterprise, in which they were both engaged and equally guilty, the latter comes into a court of equity and asks its assistance in obtaining what he conceives his just proportion of the spoils.

Such a suit can not be maintained. We regard the entire re-organization of the stock yard company as conceived and executed in fraud and palpable violation of law. If the so-called stock could be regarded as having any validity at all, it clearly belonged entirely to the Erie company. But, even if the re-organization of the company had been valid, there was no authority in its charter to issue the certificates in question for the purpose they were issued. By the express provisions of its charter, stock could only be issued "in payment for real and personal property." This was issued for neither of these purposes. We repeat, such a suit can not be maintained.

In the view we take of this case, it is conceded that Robinson agreed with appellant to return 800 shares of the so-called stock. But if his agreement was not binding in law, it imposed no legal obligation to do so which this court can recognize. Appellant substantially admits, in his own testimony, as already stated, that he surrendered the stock with the understanding that a part of it was to be used in corrupt-

ing Judge Barnard.  Of course we do not pretend to give his language, but that is what his testimony amounts to, and if the certificate was surrendered for that purpose, the agreement between him and Robinson was clearly illegal and void, and hence can not be enforced, either at law or equity.

What was the consideration for Robinson's agreement to return the 800 shares of stock?  Clearly, the delivery of the certificate for the two purposes mentioned, namely, to use part as a corrupting fund and to return the remainder. Admit one of these purposes was legal, the other was clearly not.  This being so, the agreement was not binding, and can not, therefore, be enforced by a judicial proceeding.  Nothing is better settled in the law of contracts than that if any part of the consideration upon which a promise rests is illegal, the entire promise fails.  But this is not true *e converso*.  Testing this case by that principle, this suit can not be maintained. If it can, what becomes of the maxim, *ex turpi contractu non oritur actio?*  And what are we to understand by the maxim, *in pari delicto melior est conditio possidentis?*  And how can the maintenance of this suit be reconciled with the fundamental principle, that whoever comes into a court of equity must do so with clean hands?  The principles which find expression in these familiar maxims of the law can not, in our judgment, be reconciled with a recovery in this case.

· But it has been urged, with great earnestness, that appellant paid a valuable consideration for the so-called stock.  The evidence does not, in our judgment, establish this hypothesis. What did he pay for it, either in money or property?  Not a dollar,—not a cent, so far as the record shows.  What did he promise to pay for it?  Nothing.  The evidence of Gould is, that it was given to him to secure his influence and patronage as a heavy shipper over the Erie railway.  The Erie company already had his patronage, and had had it for many years past, and it is reasonable to suppose that it obtained it by giving as good rates and accommodations, if not better, than other companies.  And, so far as future patronage and influ-

ence are concerned, it is not claimed that he entered into any obligation to continue it, even for a day. He could, if he had seen proper, on the very next day after the delivery to him of this stock, have transferred his entire business and shipping interests to other roads. Gould expressly states, in his testimony, they saw no difference between appellant's influence and patronage after this transaction occurred. So far as past transactions were concerned, viewed from appellant's own standpoint, it was clearly a mere gratuity, and, as to future operations, as we have just seen, he was perfectly free to continue his patronage or not, just as he found it to his interest or inclination so to do. So, in any point of view that may be taken of the matter, no consideration which the law recognizes was paid by him for the stock. But, even if he had paid the face value for it, he could not, under the circumstances, for the reasons already stated, recover. He parted with it to accomplish an unlawful purpose, and the law will not, therefore, assist him to recover it.

This view of the case renders it unnecessary to consider other questions which have been so ably discussed by the distinguished counsel in the cause.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*