# CASES

## ARGUED AND DETERMINED

### IN THE

# United States Circuit and District Courts.

---

WESTERN UNION TELEGRAPH Co. *v.* BURLINGTON & SOUTHWESTERN RY.
Co. (On Original Bill.)

SMITH *v.* WESTERN UNION TELEGRAPH Co. (On Cross-Bill.)

*(Circuit Court, D. Iowa. January, 1882.)*

1. **RAILROADS—CONTRACTS IN RESTRAINT OF TRADE.**
   It is not competent for a railroad company to grant to a telegraph company the exclusive right to establish lines of telegraph communication along its right of way, such contracts being in restraint of trade and contrary to public policy.

2. **SAME—DIVISIBILITY OF—EFFECT OF VOID PROVISION.**
   Where a contract in restraint of trade embraces several distinct promises, and is divisible in its nature, the illegality of one provision, which is capable of being construed divisibly, will not necessarily make the entire contract null and void.

3. **SAME—RIGHTS UNDER, PROTECTED.**
   Although a contract is invalid, yet property accumulated under it must, as between the parties, be disposed of according to equity, and the court will not refuse to deal with that property, on the ground that it was acquired under an illegal contract.

4. **PERSONAL PROPERTY, ATTACHED TO REALTY—FIXTURES.**
   Ordinarily the distinction between real estate and personal property exists in the nature of the thing itself, and does not depend upon the convention of parties with respect to it; but where things originally personal in their nature are attached to the realty in such a manner that they may be detached without being destroyed or materially injured, they are subject to the convention of parties who may agree that they shall remain personalty and be subject to removal.

v.11,no.1—1

5. FORECLOSURE SALE—PURCHASER WITH NOTICE.

Where the purchaser at a foreclosure sale of a railroad and telegraph line, running along the line of the railroad, had notice of facts sufficient to put him on inquiry that the telegraph company claimed the telegraph property as personalty, and knew that the telegraph company was in possession and operating the telegraph line, and the records of the foreclosure suit under which the sale was made contained a recital of the contract under which the telegraph company claimed the property, it is sufficient notice to such purchaser that the telegraph company claimed an interest in that property, and he was not a purchaser for value and without notice.

The Burlington & Southwestern Railway Company mortgaged its present and future-to-be-acquired property, consisting of its railroad then made and to be constructed, and having made default, the trustees to whom it was mortgaged brought suits to foreclose the mortgage, and a receiver was appointed, a decree entered, and the property sold; the receiver being the purchaser as trustee 'for the bondholders.

Subsequently to the execution of the mortgage, but before the foreclosure and sale, a contract was entered into between the railway company and the Western Union Telegraph Company, complainant herein, for the construction and operation of a telegraph line upon the right of way of the railway, among other provisions of which contract the railway company agreed as follows:

"The said railway company further agrees to give to said telegraph company the exclusive right of way on and along the line of said railway, its branches and extensions, for the construction of telegraph lines for commercial and public uses and business; and said railway company will not transport upon said railway any material for the construction of a line of telegraph in competition with the lines of said telegraph company except at and for the usual rates charged for similar transportation to other persons doing business with said railway company, nor stop its trains, or distribute materials for such parties or their employes, at other than regular stations."

Under the provisions of this contract, the principal terms of which are stated in the opinion of the court, the contracting parties went on to construct and operate the line, and at and over all the offices along the line the telegraph company affixed and exposed conspicuous signs bearing the name of the telegraph company, and used printed message blanks of their company operating the line; and these facts were notorious, and were known to the trustees in the mortgage and to the bondholders of the railway, and to the purchaser at the foreclosure sale as trustee of the bondholders.

After the sale and delivery of the master's deed, the purchaser took possession of the railway property and the telegraph lines, and cut

their connections with other lines of the telegraph company, claiming that such lines were covered by the mortgage and were conveyed to him by the master's deed. The original suit was brought to enjoin the purchaser from preventing the complainant from reconnecting the wires and using the lines according to the terms of the contract made with the railway company. A cross-bill was brought by the purchaser at the foreclosure sale against the complainant, for the purpose of obtaining a decree declaring the contract of the railway and telegraph company void, and for a confirmation of the title of the purchaser, and to restrain the telegraph company from interfering with his property.

*Cook & Dodge* and *John N. Rogers*, for complainant.

*J. M. Woolworth, P. H. Smyth,* and *James Hagerman,* for respondent and complainant in cross-bill.

McCRARY, C. J. We will consider, in the light of the foregoing facts—*First,* what are rights of the telegraph company with respect to the telegraph line and property, independently of the foreclosure proceedings; and, *second,* to what extent, if at all, are those rights affected by those proceedings.

It is insisted, on the part of the respondent, that the contract which is set out in the original bill, and under which complainant claims, is void by reason of certain provisions therein contained, which are alleged to be illegal, immoral, and contrary to public policy. Several clauses of the contract have been pointed out as coming within this description, but the one mainly relied upon is the second subdivision thereof, and which is as follows:

" The said railway company further agrees to give to said telegraph company the exclusive right of way on and along the line of said railway, its branches and extensions, for the construction and use of said telegraph lines for commercial and public uses and business; and said railway will not transport upon said railway any material for the construction of a line of telegraph in competition with the lines of said telegraph company, except at and for the usual rates charged for similar transportation to other persons doing business with said railway company, nor stop its trains, or distribute material for such parties or their employes, at other than regular stations."

In our opinion it is not competent for a railroad company to grant to a single telegraph company the exclusive right of establishing lines of telegraphic communication along its right of way. The purpose of such contracts is very plainly to cripple and prevent competition, and they are therefore void, as being in restraint of trade and contrary to public policy. They are also in contravention of the act of

congress of July 24, 1866, which authorizes telegraph companies to maintain and operate lines of telegraph "over and along any of the military or post-roads of the United States which have been or may hereafter be declared such by act of congress." 14 St. 221.

All railroads are by law made post-roads. *Pensacola Tel. Co. v. Western Union Tel. Co.* 96 U. S. 1; *Western Union Tel. Co. v. St. Joseph, etc., R. Co.* 1 McCrary, 569; [S. C. 3 FED. REP. 430;] *Western Union Tel. Co. v. American Union Tel. Co.* supreme court of Georgia, 1880.

We therefore must hold the second subdivision of the contract to be void. We are, however, inclined to the opinion that the invalidity of this provision of the contract does not render the entire agreement null and void. The contract embraces several distinct premises on the part of the railroad company, besides the one respecting the exclusive right of way; as, for example: (1) That it will furnish and distribute the poles; (2) that it will furnish laborers to erect the line; (3) that it will maintain the poles in good order and keep the wires in good repair; (4) that it will furnish office room at its railway stations; (5) that the telegraph company shall control the commercial telegraphing along the line, and receive the proceeds thereof; and numerous other engagements of like character. The consideration for these promises, and for the additional illegal promise concerning the exclusive right of way, was certain promises on the part of the telegraph company, all of which are legal. It is, therefore, a case in which the railroad company makes a number of promises to the telegraph company, one of which promises is illegal, but all the others legal, in consideration of certain promises on the part of the telegraph company, all of which are legal. The rule respecting such a contract is thus stated in Smith, Lead. Cas. Hare & Wall, notes, (5th Am. Ed.) 502: "In cases where the consideration is tainted by no illegality, but some of the * * * promises * * * are illegal, the illegality of those which are bad does not communicate itself to or contaminate those which are good, except where, in consequence of some peculiarity in the contract, its parts are inseparable or dependent upon one another." And in *Oregon Steam Navigation Co. v. Winsor*, 20 Wall. 64, the supreme court laid down the rule that contracts in restraint of trade are divisible, and "when such an agreement contains a stipulation which is capable of being construed divisibly, and one part thereof is void, as being in restraint of trade, while the other is not, the court will give effect to the latter, and will not hold the agreement to be void altogether." Page 70.

We think the contract is capable of being construed divisibly.

It is not, however, necessary to pass finally upon this question, for we are clearly of the opinion that, even assuming the invalidity of the entire contract, the plaintiff is entitled to relief, unless deprived of its interest in the property by the foreclosure proceedings, of which we shall speak presently. If we leave out of view entirely any claim of right based upon the contract, we find the complainant in possession of a line of telegraph constructed jointly by it and the railway company, each party furnishing portions of the material and labor for its erection, repair, and operation.

The railway company furnished the poles and all the labor, except a foreman, to construct the line; the telegraph company furnished a a foreman to superintend the work, and also furnished the wire and insulators. This certainly constituted the two companies joint owners of the property. In this respect the case does not differ materially from several other telegraph cases which have recently been considered in this circuit. *Atlantic & Pacific Tel. Co.* v. *U. P. Ry. Co.* 1 McCrary, 541; *Western Union Tel. Co.* v. *U. P. Ry. Co.* Id. 558; [S. C. 3 Fed. Rep. 1;] *Western Union Tel. Co.* v. *St. Joseph, etc., R. Co.* Id. 565; [S. C. 3 Fed. Rep. 430.]

In each of these cases the contract, being substantially the same as the one now before us, was held void, but the right of the railroad company, in consequence of such invalidity, to take the whole telegraph property, was emphatically denied. The following quotation from the opinion in the case first cited applies to the point now under consideration:

"No case has been cited in argument, nor have I been able to find one, which holds that a court of equity, having jurisdiction of the parties to and the subject-matter of an illegal contract should require one of such parties to give up what he has received under it, without requiring the other to do the same thing. Many cases hold that a corporation which has made a contract *ultra vires*, which has not been fully performed, is not estopped from pleading its own want of power when sued upon such contract; but that doctrine does not apply to a case where a party comes into a court of equity, and, while retaining all that he has received upon such a contract, asks to be permitted to retake what he has parted with under it. I take it there is nothing in the law, as there is certainly nothing in the principles of equity, to estop the court from saying that the obligation to return the property transferred under these contracts is mutual, and shall not be enforced against one of the parties without being at the same time enforced against the other. As the parties and subject-matter are now before the court, it is the duty of the court, as far as possible, to place them *in statu quo*."

The ruling in that case was that the railroad company should be restrained by injunction from interfering with the possession of the telegraph company until a bill should be filed, or other proceedings instituted to cancel and set aside said contracts upon the return of the consideration, and to settle and adjust, upon principles of equity, the accounts between the parties. And in the case last named this court, in discussing the same subject, said:

"If the defendants, after years of acquiescence in the contract in question, after receiving its benefits, and after a property had been built up under it to which others made claim, became suddenly convinced that it was a void contract, it was their duty to apply to the court for relief, praying a cancellation of the contract, and a full and fair settlement of all accounts growing out of its execution in the past. Until they seek some such remedy, and until a fair settlement and a full accounting can be had, they will be enjoined from attempting to eject the plaintiff or to seize the property."

In the second case the court laid down the rule, and cited many authorities to sustain it, that, assuming the invalidity of the contract, and even assuming that it was immoral, the property accumulated and constructed under it must, as between the parties, be disposed of according to equity; and the court will not refuse to deal with that property on the ground that it was acquired under an illegal contract. *Planters' Bank* v. *Union Bank*, 16 Wall. 483, and cases cited.

We are entirely satisfied with the ruling established in these cases, and it follows that the complainant, the Western Union Telegraph Company, is entitled to a decree unless deprived of all interest in the property by the foreclosure proceedings, which will now be considered.

In considering the effect upon the rights of the telegraph company of the foreclosure sale, we will first inquire whether the telegraph poles and wire and the constructed line became a part of the realty, so as to pass under the mortgage to the mortgagees as after-acquired property. It is plain that the parties did not intend to make the line a part of the realty, so as to follow the fee to whomsoever conveyed. The contract into which they entered is entirely inconsistent with such an assumption, for, if the poles, wires, and instruments had become at once part of the real estate, it would have been within the power of the railroad company, immediately upon their erection, to convey them to a third party, and thus deprive the telegraph company of all its interest under the contract. Whether the contract is valid or invalid, it may be looked into for the purpose of ascertaining the intent of the parties in placing the poles and wires upon the

right of way. But the intention of the parties is not the only thing to be considered. Ordinarily the distinction between real estate and personal property exists in the nature of the thing itself, and does not depend upon the convention of the parties with respect to it. By no agreement of parties can the bricks which are built into the wall, or the shingles that form the roof, or the stones that go into the foundation of a house, be made to retain their character as personal property. This, for the reason that they become so inseparably affixed to the realty as to be a part of it, independently of any question as to the intent of the parties. But it is otherwise (says *Denio, J.,* in *Ford* v. *Cobb*, 20 N. Y. 348) "with things which, being originally personal in their nature, are attached to the realty in such a manner that they may be detached without being destroyed or materially injured, and without the destruction of, or material injury to, the things real with which they are connected; though their connection with the land or other real estate is such that, in the absence of an agreement or any special relation between the parties in interest, they would be a part of the real estate."

With respect to this class of property the parties in interest may agree that it shall remain personalty, subject to be removed. This rule is supported by a long line of well-considered cases, and I do not understand that its soundness as a general rule is called in question here. Its application to this case can only be denied on the ground that the respondent is an innocent purchaser at the master's sale, without notice of any claim on the part of the complainant to the telegraph property. We do not find it necessary to decide the important question whether the railroad company has the fee of the land acquired for right of way. We should, however, be slow to hold that a railroad corporation, under the law of Iowa, may obtain for this purpose a strip of land across the state, perhaps cutting through farms and villages, and use it for any purpose except for right of way, or convey it to any party for private use.

The consequences which might flow from such a doctrine would be very serious indeed. Redfield, Railways, 247, 249.

As between the parties, it is well settled that the mortgagee, as to after-acquired property, takes only the interest of the mortgagor. Only the interest of the railway company in the telegraph line, subject to the interest of the telegraph company therein, passed under the mortgage. *U. S.* v. *New Orleans R. R.* 12 Wall. 362; *Fosdick* v. *Schall*, 99 U. S 235; *Myer* v. *Car Co.* 102 U. S. 1; *Loomis* v. *Railroad Co.* Dist. Iowa, Jan. 1882.

It only remains to be determined whether the respondent, as purchaser at the master's sale, can be regarded as a *bona fide* purchaser of the telegraph line for value, and without notice of the claim of the telegraph company. We think he cannot be so regarded, and for the following reasons:

1. The telegraph company had a right to claim its interest in the telegraph line as personal property against the mortgagee, as well as against the railway company. The consent of the former to its retaining its character as personalty was not necessary. *Tifft* v. *Horton*, 53 N. Y. 377, and cases cited.

Whether the purchaser at the foreclosure sale would ordinarily take only the right of the mortgagor in after-acquired property, or should be regarded in the light of a purchaser for value without notice, need not be determined, because—

2. The respondent, Smith, had notice of the complainant's claim upon said property, or, at least, the facts, as they existed and were known to him, were sufficient to put him upon inquiry. The agreed statement of facts shows that he had operated the road as receiver for nearly five years prior to his purchase, during which time he must have known of the existence of the telegraph contract, and of the fact that the line had been constructed and was being constructed thereunder; and it is stipulated that "the trustees in the aforementioned mortgage and the said Smith had full knowledge that the contract had been made between the railroad company and the telegraph company; but said trustees were not informed of the contents thereof, save that some agreement was thereby made for the operation of the line." This was sufficient to put, not only respondent, but the trustees, upon inquiry, and inquiry would have led them to a knowledge of all the facts. Besides, we think the telegraph company was, in an important sense, in possession of the line. All the commercial business done upon it was done in its name. Printed message blanks were in constant use, showing that it was operating the line. Its sign appeared at all the offices along the line, and even the operators were employes of the railway company. We think the possession of the telegraph company was sufficiently open and notorious to advise the public and the purchaser at the foreclosure sale that they had or claimed an interest in the property.

3. At the time of the master's sale there was on file in the foreclosure case an amended bill of the trustees in the mortgage, alleging the execution of the telegraph contract, reciting its provisions, and containing the following averment: "That said contract is subject to

said mortgage, and these complainants are entitled to all the rights, privileges, and benefits of said railway company, by, in, under, or in relation thereto, and said mortgage is a first lien thereon." And said amended bill prayed for a decree "declaring said contract subject to said mortgage, and said mortgage a prior lien thereon, and foreclosing the right, title, and interest of the railway company therein."

To this amended bill an answer was filed, also prior to the master's sale, substantially admitting the allegations contained therein, and consenting to a decree as prayed. After the master's sale, and upon the filing of the bill in the case, said amended bill was dismissed.

Without considering the question so much discussed by counsel, whether this record should operate to estop the complainant from now claiming the ownership of the telegraph line, we have no hesitation in saying that it was sufficient notice to the purchaser at the sale that the telegraph company claimed an interest in that property, so that he was not a purchaser for value and without notice.

We are thus brought to the conclusion that the rights of the complainant, the telegraph company, were in nowise affected by the foreclosure proceedings.

The respondent, in his cross-bill, does not offer to account. He does not recognize, but, on the contrary, distinctly repudiates, the claim of complainant of an interest in the telegraph property. The claim of the respondent plainly is that he is the owner of the entire line, and entitled to the possession and control of the same without interference from the complainant. In his answer he distinctly admits the seizing of the telegraph property and lines, and the cutting of the wires to destroy the connection between them and the remaining portion of the Western Union Telegraph system, and the prayer of his cross-bill is that the telegraph company may be enjoined from intermeddling or interfering with said lines and wires. In accordance with the principles above announced, the decree must, therefore, be against the complainant in the cross-bill. The prayer of the complainant in the original bill is as follows:

"Therefore, your orator prays that an injunction may issue to restrain these defendants, their agents, servants, and employes, from preventing your orator's reconnecting the wires that have been severed as aforesaid, and to restore the connections which have been severed, and from preventing your orator from using the said lines and wires, and enjoying the benefits to which it is entitled under said contract of June 28, 1871, and from interfering with your orator in the use of said telegraph wires until the rights of the

parties may be adjudicated in the said foreclosure proceeding herein hereto-fore referred to, and until the further order of this court, and that upon the final hearing of this cause the said injunction may be made perpetual."

We do not think it proper to grant the complainant all the relief here asked, but, in our own view of the case, it is entitled to a decree to enjoin and restrain the respondents, their agents, servants, and employes, from preventing the complainant's reconnecting any wire that may have been severed, and from interfering with the restoration of any connection that may have been severed, and from preventing complainant from possessing and using said lines and wires as heretofore, until the rights of the parties with respect thereto shall be adjudicated.

Love, D. J., concurs.

### NOTE.

The first point made by Judge McCrary is that "it is not competent for a railroad company to grant to a single telegraph company the exclusive right of establishing lines of telegraphic communication along its right of way." Whether this can be sustained on the second reason given by the learned judge involves grave constitutional issues. It is alleged that all railroads are post-roads, and that under the act of congress of July 24, 1866, all telegraph companies are authorized to maintain and operate lines of telegraph over post-roads of the United States; and that, consequently, no telegraph company can be excluded from this right. It is a question of much interest whether congress has the constitutional power to require a railroad corporation to permit telegraph companies to use its bed for their own purposes. This question, however, I do not propose to discuss, passing to the first reason given by Judge McCrary, viz., that a contract giving this right exclusively to a particular company is void, "as being in restraint of trade and contrary to public policy." On this topic the following remarks may be made:

Contracts binding parties not to do business within a particular district have been sustained when there is a suficient consideration; e. g., the sale of good-will, or the division of a particular territory between conflicting claimants. When such an arrangement is bona fide made in connection with a sale of good-will, public policy, so far from discountenancing it, requires that it should be faithfully carried out. So far from trade being restrained by permitting a professional man or a tradesman to sell the good-will of his business, trade is furthered by such an arrangement, since in this way energies which might otherwise be lost are preserved. The party moving away obtains something like a price for his past labor; the market value of labor of the same class is placed on a more definite footing; and while he is able to pursue his calling elsewhere under more convenient conditions, immediate activity is given to his assignee, whom the conditions of the place surrendered may suit. Mitchell v. Reynolds, 1 P. Wms. 181, and notes to 1 Smith's Lead. Cas.; Mellan v. May, 11 M. & W. 653; Leather Co. v. Lorsort, L. R. 9 Ex. 345; Whitney v. Slayton, 40 Me. 224; Dean v. Emerson, 102 Mass. 480;

*Richardson* v. *Peacock*, 33 N. J. Eq. 597; *Guerand* v. *Dandelot*, 32 Md. 561; *Warfield* v. *Booth*, 33 Md. 613; *Lange* v. *Work*, 2 Ohio St. 519; *Bowser* v. *Bliss*, 7 Blackf. 344; *Heichew* v. *Hamilton*, 3 Iowa, 396; *Hedge* v. *Lowe*, 47 Iowa, 137; *Smalley* v. *Greene*, 50 Iowa, 241.

When we come, however, to the question of the validity of an agreement, the effect of which is to shut off competing interests in a particular staple or industry from the community at large, the decisions are by no means harmonious. As a general rule we may regard it as settled that no agreement will be sustained, the effect of which would be to fasten on the community the monopoly of an important staple or industry. It is true that in an early case in Massachusetts it was held that an agreement not to run an opposition stage between Boston and Providence was valid, though this may be put on the ground that the act complained of was a breach of trust, (*Pierce* v. *Fuller*, 8 Mass. 223;) and the same explanation may be given of a ruling made shortly afterwards sustaining an agreement not to compete for seven years in the north-west trade. *Perkins* v. *Lyman*, 9 Mass. 522. But an agreement not to run steam-boats in the state of California has been held invalid, (*Wright* v. *Ryder*, 36 Cal. 242;) and so of an agreement not to manufacture goods in general, (*Taylor* v. *Blanchard*, 13 Allen, 370;) and so of an agreement not to sell marl off of the vendor's land. *Brewer* v. *Marshall*, 4 C. E. Green, 537. On the other hand, a contract by a dealer in New Jersey not to ship poultry to New York or Washington has been held not to contain an unreasonable restriction. *Richardson* v. *Peacock*, 33 N. J. Eq. 597. It has also been held that it is not against the policy of the law for parties to bind themselves, within a certain range, to deal exclusively with each other. The law of partnership rests on a principle of this kind. And we have still more pointed illustrations in the English cases which sustain purchases of land from brewers with covenants that the purchaser, in case he open a public house, shall buy all his beer from the vendor. *Cooper* v. *Tindell*, 3 Comp. 386*a*; *Gale* v. *Reed*, 8 East, 80; *Catt* v. *Tourle*, L. R. 4 Ch. 654. See *Schwalm* v. *Holmes*, 49 Cal. 665. A covenant, also, by an author to write exclusively for a particular publisher has been sustained. *Morris* v. *Colman*, 18 Ves. 437. But to validate covenants of this class the commodity or services rendered should be fairly up to the market value, (*Thornton* v. *Sherratt*, 8 Taunt. 529;) and the restriction will not be extended so far as to cover agreements by employers to induce their employes to deal exclusively in a particular store. *Crawford* v. *Wick*, 18 Ohio St. 190.

Whether such a restriction as that immediately before us can be sustained, came up before the supreme court of Illinois in *Western Union Telegraph Co.* v. *Chicago R. R.* 86 Ill. 246,* and the validity of such a contract was sustained. The question is, does such a contract give the telegraph company a practical monopoly? If it does, the contract is open to the same objection as are contracts to absorb commodities, competition in the production and sale of which is essential to the well-being of the community. Contracts to obtain a monopoly of such staples (*e. g.*, wheat or coal) have been repeatedly and rightfully held invalid. *Rex* v. *Waddington*, 1 East, 143; *Arnot* v. *Coal Co.* 68 N. Y.

*It should be observed that from the language of the court in this case it may be argued that all the court decided was that a monopoly could be given of a particular set of poles.

558; *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173; *Crawford* v. *Wick,* 18 Ohio St. 190; *Central Ohio Salt Co.* v. *Guthrie,* 35 Ohio, 666; *Craft* v. *McConoughy,* 79 Ill. 346; *Raymond* v. *Leavitt,* Sup. Ct. Mich. 1881; *In re India Bagging Ass'n,* 14 La. Ann. 168.

This has been also held to be the rule with agreements to absorb and monopolize the transportation of a community. *Oregon Steam Nav. Co.* v. *Winsor,* 20 Wall. 64; *Hooker* v. *Vanderwater,* 4 Denio, 349; *Stanton* v. *Allen,* 5 Denio, 434; *Maguire* v. *Senock,* 42 Ind. 1. And on this ground Judge Grier, when sitting as district judge in Pittsburgh, held that it was an indictable conspiracy for all parties concerned in navigating the Pennsylvania canals to unite in fixing absolute prices in such a way as to oppress business. *Transportation Cases,* Wharton, Precedents, No. 658. Telegraphs are now essential to business, and as such are to be kept open to competition (unless the legislature should otherwise determine) in the same way that common carriage is to be kept open to competition. An agreement to give a particular line of carriers monopoly in a state would not (without legislative aid) be enforced, nor should a contract to give a monopoly to a particular telegraph company. The only question is, does a contract, by a railroad company, to give the exclusive use of its bed to a telegraph company give the telegraph company a monopoly in that section of the country? If an opposition company could run its wires on a parallel line, without incurring an expense which would be prohibitive, it is hard to see why the railroad company that makes a contract of this kind should not be bound to it.

Assuming, however, the invalidity of this special stipulation, the conclusion of Judge McCrary, that other stipulations are not thereby invalidated, cannot be assailed. When there are several stipulations in a particular agreement, the fact that one of those stipulations is illegal does not defeat a recovery on the others, when the stipulations are divisible and the consideration is not in itself illegal. *Green* v. *Price,* 13 M. & W. 695; *Price* v. *Green,* 15 M. & W. 346; *Bank of Australasia* v. *Briellat,* 6 Mo. P. C. 152; *Mayfield* v. *Wadsley,* 3 B. & C. 34; 5 D. & R. 228; *Kennan* v. *Cole,* 8 East, 336; *McAllen* v. *Churchill,* 11 Moore, 483; *Gelpcke* v. *Dubuque,* 1 Wall. 175; *Goodwin* v. *Clarke,* 65 Me. 280; *Carlton* v. *Woods,* 28 N. H. 290; *Van Dyck* v. *Van Beuren,* 1 Johns. 362; *Saratoga Bank* v. *King,* 44 N. Y. 89; *Leavitt* v. *Palmer,* 3 Comst. 19; *Woole* v. *Gray,* 6 Barb. 398; *Tracy* v. *Talmadge,* 4 Kern. 162; *Leavitt* v. *Blatchford,* 5 Barb. 9. See Benj. Sales, § 505; *Mallan* v. *May,* 11 M. & W. 653; *Carrigan* v. *Ins. Co.* 53 Vt. —; *Lange* v. *Werk,* 2 Ohio St. 519; *Widoc* v. *Webb,* 20 Ohio St. 431; *Hynes* v. *Hayes,* 25 Ind. 31; *Kimbrough* v. *Lane,* 11 Bush, 556; *Newbury Bank* v. *Stigall,* 41 Miss. 142; *Valentine* v. *Stewart,* 15 Cal. 387. In *Carrigan* v. *Ins. Co.* 53 Vt., it was held that while an insurance of liquors for illegal sale is invalid, in a case where the assured was a druggist, and only a small proportion of the property insured was liquor, and nothing of illegality appearing in the contract, or in the design in entering into it, and the contract being collateral to the occasional acts of unlawful selling, it is not invalid.

A contract may be fraudulent or otherwise illegal as to the parties, yet bind as to those persons innocently taking title under it. And a contract

may be divisible so as to be bad as to parties, but good as to strangers acting *bona fide* on it. *Bradway's Estate*, 1 Ash. 212.

In other words, "in cases where the consideration is tainted by no illegality, but some of the conditions or promises are illegal, the illegality of those which are bad does not communicate itself to or contaminate those which are good, except where, in consequence of some peculiarity in the contract, its parts are inseparable or dependent upon one another." Smith & C. (7th Am. Ed.) 681. *A fortiori*, when a transaction is separated by the parties into two agreements, one legal and the other illegal, the legal agreement can be enforced, and the transaction *pro tanto* sustained. *Odessa Co.* v. *Mendel*, L. R. 8 Ch. D. 235.

It is otherwise when the stipulations, legal and illegal, are so interwoven that the legal one cannot be sustained without sustaining the illegal. 1 Wms. Saund. 66, note 4; *Waite* v. *Jones*, 1 Scott, 59; *Neuman* v. *Neuman*, 4 M. & S. 66; *Gaskell* v. *King*, 11 East, 165; *Wigg* v. *Shuttleworth*, 13 East, 440; *Ladd* v. *Dillinghast*, 134 Mc. 316; *Woodruff* v. *Heyneman*, 11 Vt. 592; *Saratoga Bank* v. *King*, 44 N. Y. 87; *Rose* v. *Truax*, 21 Barb. 361; *Donallan* v. *Lenox*, 6 Dana, 91; *Langdon* v. *Gray*, 52 How. (N. Y.) Pr. 387; *Frazier* v. *Thompson*, 2 Watts & S. 235; *Tobey* v. *Robinson*, 99 Ill. 222.

"The general rule is that where you cannot sever the illegal from the legal part of a covenant, the contract is altogether void; but where you can sever them, whether the illegality be created by statute or by the common law, you may reject the bad part and retain the good." *Willes*, J., in *Pickering* v. *R. R.* L. R. 3 C. P. 250, (adopted in Leake, 2d Ed. 781,) citing *Mauleverer* v. *Redshaw*, 1 Mod. 35; *Collins* v. *Blantern*, 2 Wils. 351; see *Gelpcke* v. *Dubuque*, 1 Wall. 221; *U. S.* v. *Bradley*, 10 Pet. 343; *Deering* v. *Chapman*, 22 Mc. 316; *Roby* v. *West*, 4 N. H. 285; *Coburn* v. *Odell*, 30 N. H. 540; *Woodruff* v. *Heniman*, 11 Vt. 592; *Frazier* v. *Thompson*, 2 Watts & S. 235; *Raguet* v. *Roll*, 7 Ohio, 70; *McBratney* v. *Chandler*, 22 Kan. 692; *Everhardt* v. *Puckatt*, 73 Ind. 409; *Anderson* v. *Powell*, 44 Iowa, 20.

So far as concerns the statute of frauds, the same test is applied. When part of a contract is invalidated by that statute and the contract is severable, then the invalidation is only *pro tanto;* though it is otherwise when the contract cannot be severed. *Mayfield* v. *Wadsley*, 3 B. & C. 361; S. C. 5 D. & R. 228; *Lexington* v. *Clarke*, 2 Vt. 223.

Thus, where C., having contracted to do certain work for E., but the work being suspended on account of failure on E.'s part to pay, and T. having asked C. to go on with the work, promising to pay him in full, it was held that C. could recover from T. for the work done after the promise, but not for that done before the promise. *Rand* v. *Mather*, 11 Cush. 1. And, generally, the fact that a deed contains powers or conditions that are illegal, does not avoid the deed, unless these powers or conditions qualify the whole conveyance. If they are independent and can be severed without injuring the contract, their illegality does not vitiate the other portions of the deed. *Pickering* v. *R. R.* L. R. 3 C. P. 235; *Payne* v. *Brecon*, 3 H. & N. 572; *Greenwood* v. *Bp. of London*, 5 Taunt. 527.

It is said also by Mr. Pollock (Cont. 3d Ed. p. 338) that where any part of the consideration for a promise, or set of promises, is unlawful, the whole

agreement is void. This undoubtedly holds good in cases in which the unlawful consideration permeates the whole contract, as where, for instance, the consideration of a promise (or a series of promises) is (1) illicit cohabitation, and (2) the securing the services of a housekeeper. But it is otherwise where the illegal consideration does not permeate the whole contract. Supposing, for instance, A. agrees to pay B. $100 for goods sold, part being sold on Sunday, and part on Monday. Now, for the Monday sale, the vendee could have a decree of specific performance; and if so, the fact that the transaction was turned into a common account with the Sunday sale, is no reason why the vendor, who would be liable in this suit for specific performance, should not be entitled to his remedy for the Monday sale against the vendee. And it is hard, also, to see why this right to recover for the Monday sale should be affected by the fact that the vendor took for both transactions, embracing the Sunday sale and the Monday sale, a single note. Undoubtedly part of the consideration is illegal; but if the vendee, on the untainted part of the transaction, could sue the vendor, so can the vendor sue the vendee. And there is high authority to this effect. Thus, in Pennsylvania, no action, by statute, will lie upon a note given for a tavern reckoning exceeding 20 shillings; but if a note beyond that amount covers other items of lawful indebtedness, there can be a recovery for the latter items. *Yundt* v. *Roberts*, 5 S. & R. 139; *Duchnan* v. *Hagerty*, 6 Watts, 65, (overruling *Ogden* v. *Milier*, 1 Bro. 147;) *Chase* v. *Burkholder*, 18 Pa. St. 48. And when a note is founded on several considerations, each fixed by a separate contract, the note is valid to the extent of the lawful consideration. *Frazier* v. *Thompson*, 2 W. & S. 235; *Warren* v. *Chapman*, 105 Mass. 87; *Hynds* v. *Hayes*, 25 Ind. 31. See, *contra*, *Deering* v. *Chapman*, 22 Me. 488; *Widoc* v. *Webb*, 20 Ohio St. 431; overruling *Doty* v. *Bank*, 16 Ohio St. 133. Compare criticism of Mr. Wald, Wald's Pollock, 318. In *Bixby* v. *Moore*, 51 N. H. 402, it was held there could be no *quantum meruit* recovery of wages, when part of the work was illegal selling of liquor. But when a note has been given in part payment of an account, it is no defence that part of the account was illegal, if the amount of the note is less than the amount of the legal part of the account. *Warren* v. *Chapman*, 105 Mass. 87. The express point decided in the principal case (viz., that, if divisible, the valid part of such a contract could be sustained) was ruled in *Price* v. *Green*, 16 M. & W. 346. In that case the agreement was not to do business in London, which was held valid, or in any place within 600 miles of London, which was held invalid. It was held that the invalid condition could be stricken out as surplusage. To the same effect is *Oregon Steam Nav. Co.* v. *Winsor*, 20 Wall. 64.

The question of the divisibility of insurance stipulation is discussed in an able note in 25 Alb. Law J. 244. See, also, May, Ins. (2d Ed.) § 279; Wood, Ins. § 328; Clements, Ins. Dig. 92.